EDWARD HAUSER et al.

v.

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed June 23, 1904.*

1. CRIMINAL LAW—*burden of proving alibi is on the defendant.* To establish an *alibi* the defendant has the burden of proving facts and circumstances which, when considered with all the evidence relied upon to establish his guilt, is sufficient to create in the minds of the jury a reasonable doubt of the truth of the charge.

2. SAME—*admissibility of evidence as to actual tests.* Evidence is admissible of actual tests made by witnesses as to the view which could be had of persons and objects under practically the conditions testified to by the witness who identified the defendants as existing when he first saw them, the discrepancies in conditions, if any, affecting the weight of the testimony,—not its competency.

3. SAME—*effect of bringing prisoners into court in irons.* The fact that the defendants are seen in irons by jurymen on two occasions before convening of court is not ground for reversing a judgment of conviction, although courts should not permit prisoners to be unnecessarily exposed in irons to the view of the jury in the absence of evident danger of escape.

4. SAME—*prosecutor may exhibit and comment upon hotel register used to prove alibi.* It is not error to permit counsel for the People to exhibit to the jury the hotel register relied upon by the defendants in attempting to prove an *alibi*, and to comment upon the clean appearance of the book and the fact that all names were in the same handwriting and appeared to be made at the same time, as tending to show it was not a register in daily and actual use.

5. SAME—*effect of stating name of a defendant coupled with an alias.* Stating, in an instruction, the name of a defendant in a criminal case coupled with an *alias* is not improper, where the indictment contains the same names and there is no plea of misnomer.

6. SAME—*there is no legal presumption that witness has testified truly.* There is no presumption which may be announced as a rule of law in an instruction, that in the absence of anything appearing to the contrary an unimpeached witness has testified truly.

7. SAME—*court may allow witnesses to testify whose names are not on the indictment.* It is within the sound discretion of the trial court to allow witnesses to be examined in a criminal case whose names are not endorsed on the indictment.

WRIT OF ERROR to the Circuit Court of Grundy county; the Hon. SAMUEL C. STOUGH, Judge, presiding.

E. L. CLOVER, for plaintiffs in error.

H. J. HAMLIN, Attorney General, and C. F. HANSON, State's Attorney, (GEORGE B. GILLESPIE, of counsel,) for the People.

Mr. JUSTICE BOGGS delivered the opinion of the court:

The grand jury in and for the county of Grundy returned into the circuit court of that county, at its March term, 1903, an indictment charging Samuel J. Ritchie, (alias Sam Ritchie,) Edward Howell, (alias Edward Hauser, alias LosAngeles Whitey,) John Freeland, (alias William Edwards, alias William Foley,) and Charles Mitchell, with the crime of burglary. The accused were at that time confined in the common jail of the county under the charge of having committed the offense preferred in the indictment, and were placed on trial at said March term of the said court. The jury returned a verdict of not guilty as to the defendant Ritchie and a verdict of guilty as to each of the other defendants. Motions for new trials and in arrest of judgment were entered and overruled, and sentence was pronounced on each of the defendants so found guilty, in accordance with the verdict of the jury. This is a writ of error sued out by the plaintiffs in error who were so convicted, to reverse the judgments entered against them.

During the night of the 28th and 29th of October, 1902, the Exchange Bank of Gardner, known locally as Allison's Bank, in the village of Gardner, in Grundy county, Illinois, was broken into by burglars, who by the use of drills and other tools opened the doors of the vault, and by the use of some kind of explosives blew open the safe and stole therefrom the sum of $3200. The bank was entered shortly after midnight on the morning of October 29, and the burglars were engaged in the work of breaking the door of the vault and in blowing open the safe for some three hours. The village of Gardner is a station on the Chicago and Alton railroad about seventy-

five miles south-west of Chicago. The indictment charged the plaintiffs in error with the commission of this crime.

The testimony introduced in behalf of the People was sufficient, standing by itself, to justify the verdict returned by the jury.

The defense sought to be interposed in behalf of the defendant indicted under the name of John Freeland (*alias* William Edwards, *alias* William Foley,) was that of an *alibi*, and the defense was sufficiently supported by testimony produced upon the hearing, unless the jury were unwilling to regard the witnesses as entitled to belief, or regarded them as in error as to time or day when, according to their testimony, they saw the plaintiff in error at another place than where the crime was committed. It appeared from the testimony of these witnesses that they knew the defendant indicted as Freeland (*alias* Edwards) as William or Billy Edwards; that he resided on West Madison street, in the city of Chicago; that at about the hour of ten o'clock in the evening of the 28th day of October, 1902, the defendant Freeland (or Edwards) came into a saloon kept by one Miller, at the corner of Washington boulevard and Sangamon street, in said city of Chicago; that the saloon was kept open during the entire night, and that Freeland (or Edwards) was in the saloon until some time after the hour of one o'clock on the morning of October 29, 1902, and that his wife brought him to his home on West Madison street at about the hour of two o'clock on that morning. The burglars entered the bank at Gardner shortly after the hour of one o'clock on the morning of October 29 and remained in the bank for about three hours. These witnesses fixed the time at which Freeland (*alias* Edwards) was in the saloon in Chicago by reference to a ball which had been given at Bricklayers' Hall, in the city of Chicago, on the night of the 27th of October, 1902.

The defendant indicted under the name of Edward Howell (*alias* Edward Hauser) and the defendant indicted

under the name of Charles Mitchell, the latter of whom
testified his name was Thomas Clark but who admitted
that he told the officers who arrested him that his name
was Charles Mitchell, also sought to establish an *alibi*.
Mitchell (*alias* Clark) testified he came to Louisville, Ken-
tucky, from Paducah, on a freight train arriving there on
the morning of the 27th day of October, 1902, and Hauser
testified that he arrived in said city of Louisville from
Knoxville, Tennessee, on the same morning, and both
testified that they had been acquainted before but met
at a restaurant in Louisville on that morning without
any previous arrangement.    They both testified that on
the afternoon of October 27 they engaged lodging for a
week at a rooming house kept by Mrs. Dolly Hayden at
809 Market street, in that city; that they slept together
in that room on the night of October 27, and that during
the morning and afternoon of the 28th they visited many
different saloons in Louisville and indulged in intoxicat-
ing drinks, and at about the hour of eleven o'clock on
the night of the 28th they returned, in an intoxicated
condition, to the room in the lodging house on Market
street; that after they were in the room Hauser indulged
in singing, and Mrs. Hayden came to the room and or-
dered them to be quiet; that a controversy followed, and
she threatened to call the police and have them ejected,
and that they left her lodging house; that after visiting
many saloons, finally at about the hour of four o'clock
in the morning of October 29 they went to a lodging
house at 531 West Market street, Louisville, called "The
New Oakwood," registered their names as lodgers there,
engaged rooms and slept there during the remainder of
the night.    Mrs. Hayden, the keeper of the lodging house
at 809 Market street, and Joseph Edwards, the night
clerk of the New Oakwood lodging house, testified as
witnesses in corroboration of the testimony of Hauser
and Mitchell, and the book purporting to be the register
of the New Oakwood lodging house was also produced

in evidence.   J. H. Hagar, who had been connected with the police department of the city of Louisville for fourteen years, during the latter part of his service having been chief of police, testified that the general reputation of Mrs. Dolly Hayden for truth and veracity was bad.

The burden of establishing the defense of an *alibi* is on the defendant, and to maintain it, it is incumbent upon him to prove facts and circumstances which, when considered in connection with all the evidence relied upon to establish his guilt of the crime charged, is sufficient to create in the minds of the jury a reasonable doubt of the truth of the charge.   (*Carlton* v. *People*, 150 Ill. 181.)   We are unable to say that the jury should have acquitted either of the plaintiffs in error upon the ground the testimony relied on to maintain the defense of an *alibi* should have created a reasonable doubt of his guilt, in the face of the evidence produced by the prosecution to establish the truth of the charge against him.   A brief reference to the testimony produced by the prosecution demonstrates the strength of the case made by the People.

Eddie Larson, a boy aged fourteen years, and Thomas Mulvey, of about the age of sixteen years, both residents of Gardner, testified that they saw a man, whom they identified to be the defendant John Freeland, (*alias* Billy Edwards,) in Gardner at about the hour of eight o'clock on the evening of the second Sunday previous to the burglary; that they first saw him at a bon-fire in the street in front of the post-office, warming himself; that he came to where they were and engaged in conversation with them, and asked them where the town marshal stayed at night, and that they told him in the fire engine house; that he looked in at the window of Peck's jewelry store and saw a safe that was there, and asked them some questions about the jewelry store and the bank having money in their safes; that they showed him the engine house, and that he went down near a small house in which the railroad men kept their tools, situated about

ten or fifteen feet from the engine house; that the boys walked down there, and he asked them what was in the small house, (meaning the tool house,) and they told him it was where they kept the tools the railroad men worked with; that he told them he was going to get on a train that had just come in; that he met two other men coming down the railroad track, and that Freeland (or Edwards) stopped and talked with the men and asked what car they were in, and asked the boys to show the men the way to a lunch room, and that they saw no more of him until after he was arrested.

Nels Edmundson, night marshal of the village of Gardner, testified that he went on duty as such marshal at three o'clock in the afternoon of each day and remained on duty until three o'clock in the morning of the following day; that the fire engine house was used as a place for the night marshal to stay between rounds; that three lanterns were kept lighted in the engine house; that he lighted them at about four o'clock in the afternoon of October 28, 1902; that he moved around the business part of the village from the engine house and came back to it a few minutes before one o'clock in the morning of October 29, 1902, went inside, locked the door, took off his overcoat and sat down and was smoking his pipe when some one rapped at the door; that he opened the door and saw the defendant Hauser standing at the door, the defendant Mitchell standing by him, and the defendant Freeland (or Edwards) a little behind them, and that he saw other men whom he did not recognize; that Freeland (*alias* Edwards) had a gun and tapped him on the head with it, and that Hauser and Mitchell grabbed him, swung him around and pulled his cap down over his eyes; that they took his billy and pistol from him, tied his hands behind his back and left him for a few minutes in charge of Hauser and Mitchell; that the others returned and forced him to go with them to the bank, the door of which had been forced when he arrived there; that

Hauser and Mitchell walked on either side of him as they went to the bank, took him back of the vault, tied him to a chair, and one of them, whom he thought to be Freeland, (*alias* Edwards,) stayed with him while the other parties drilled open the door of the vault and blew open the safe, and took the money, mostly gold and silver, therefrom; that about four o'clock they left the bank, made him walk down an alleyway while a freight train was passing on the track near the bank, and after the train had gone made him walk back and forth along the track of the railroad while they were debating what they would do with him; that they talked about tying him in a box-car; that his cap was forced down over his eyes so he could only see them "as high as their vests;" that he counted six of them; that they finally concluded to take him down to the school house, and did so; that they took him into a little room under a stairway leading to the second story, laid boards over the stairway entrance to the cellar, gagged him, tied him to a chair, set the chair on the boards over the stairway entrance, put a rope around his neck and fastened it to a beam above his head, and left him there. He identified Hauser, John Freeland (*alias* Billy Edwards) and Mitchell, all of the plaintiffs in error, as three of the men who overpowered him in the engine house and subsequently engaged in the burglary of the bank.

Charles Butterfield, also a resident of the village of Gardner, a baker, testified he went to his work in his bakeshop in that village at about the hour of two o'clock in the morning of October 29; that after engaging in mixing the dough and firing the oven until about four o'clock he went over to the depot of the Chicago and Alton Railroad Company, and on his way back met three men; that soon after he went again to the depot, and that he there saw two of the same men; that they asked him what time the train came, and that he answered them; that they engaged in conversation for perhaps

half an hour, until the train came, when the two men and some others went away on the train. He identified John Freeland (*alias* Billy Edwards) as one of the two men that he met on the street and at the depot, and testified that the conversation at the depot was most largely between himself and the man he recognized as plaintiff in error Freeland (or Edwards).

Harry E. Humphrey was the conductor and J. B. Evans was the porter on a train on the Chicago and Alton railroad which left St. Louis at nine o'clock P. M., October 28, 1902, for Chicago. They testified the train. was signaled to stop at Gardner; that they received seven men there, and left that station for Chicago at fifty minutes after four o'clock on the morning of October 29; that five of the men who entered the train at Gardner remained in the cars until the train reached a point in the yards at Brighton Park, a suburban station in the city of Chicago, where the train was stopped for a few minutes before pulling up to the platform, to await the movements of a freight train on the track ahead of it; that these five men got off the train while it was so in the yards at Brighton station, though the conductor told them it was some distance up to the depot and the train would soon pull up there; that at the station the conductor received a message advising him that the bank at Gardner had been burglarized. The conductor recognized the plaintiff in error Freeland (*alias* Edwards) and the plaintiff in error Mitchell as two of the men who entered the train at Gardner and left it in the yards at Brighton Park. Evans, the porter on the same train, testified that he admitted the passengers to the train at Gardner, and afterwards pointed them out to the conductor as the men from whom tickets or fares should be collected; that he saw the five men leave the train at Brighton Park, and testified that he recognized the plaintiffs in error as being three of such passengers.

E. B. French was conductor and William Patterson was flagman on a Chicago and Alton passenger train which left Chicago on the 28th day of October, 1902, at 5:30 o'clock in the evening, for Joliet. Joliet is about half the distance between Chicago and Gardner. This train ran no farther than Joliet, but the conductor issued exchange or transfer checks good on another train on the same road by which passengers could go from Joliet to Gardner. Conductor French and flagman Patterson both testified that at Summit, a station twelve miles out from Chicago, four men got on the train, two of whom had tickets for Gardner. The conductor took up their tickets and gave them transfers or exchange checks. Both the conductor and flagman identified the plaintiffs in error Hauser and Mitchell as two of the men who entered the train at Summit and left it at Joliet on the night before the burglary.

The police placed a watch on a flat occupied by Freeland (*alias* Edwards) on West Madison street, in Chicago, and on the 11th day of November, 1902, saw the plaintiffs in error together in the flat, and soon thereafter arrested them while they were on the street together.

In arriving at a conclusion as to the guilt or innocence of the plaintiffs in error, the jury would necessarily take into consideration the credibility and reliability of the witnesses in behalf of the prosecution and those relied upon to establish the *alibi.* Either the various witnesses who testified for the prosecution were mistaken as to the identity of the plaintiffs in error or testified falsely, or the witnesses relied upon to establish the *alibi* were mistaken as to the identity of the persons or as to the time when they saw such persons, or testified falsely. The appearance of the different witnesses while giving their testimony, their deportment, apparent intelligence and honesty, their fairness or bias or prejudice, if any appeared, and the degree of their judgment and discretion, the probability or improbability, reason-

ableness or unreasonableness of their statements, and all
the ordinary circumstances disclosed by the proof which
make for or against the credibility of the witness, entered
largely into the determination of the question of the
credibility of each of the witnesses and of the weight and
value which ought to be accorded to the testimony. The
jury had the witnesses before them, saw them and heard
them testify, and therefore had advantages and opportu-
nities for reaching a correct conclusion as to the weight
and reliability of the testimony far superior to the facili-
ties which the written transcript of the testimony affords
to us. We are unable to perceive any reason why we
should decide that Larson and Mulvey, the two young
men, (one a coal miner, the other a clerk in a store,) Ed-
mundson, the city marshal, Butterfield, the baker, all
residents of Gardner; French and Humphrey, the rail-
way conductors, Patterson, the flagman, and Evans, the
porter, on the trains of the Chicago and Alton railroad,
should have been discredited by the jury or their testi-
mony deemed less reliable than that of the witnesses
for and in behalf of the plaintiffs in error. On the con-
trary, a careful and painstaking reading of all of the
testimony, and full consideration and reflection thereon,
have brought us to the conclusion the jury were fully
justified in holding the plaintiffs in error guilty of the
charge against them.

We do not think the court erred in refusing to grant
the motion of the plaintiffs in error for leave to re-call
Nels Edmundson, the village marshal, for the purpose
of propounding to him further and other questions as a
foundation for the admission of testimony that Edmund-
son had made statements out of court contradictory to
his testimony while on the stand. A great many ques-
tions were propounded to Edmundson as foundations for
the introduction of alleged contradictory statements,
and a number of witnesses were heard to testify in be-
half of the plaintiffs in error as to statements alleged to

have been made by Edmundson out of court which were thought to be inconsistent with his testimony. The motion to re-call Edmundson was not made until after the close of the evidence for the prosecution and after much of the evidence in behalf of the plaintiffs in error had been heard. The court gave leave to counsel for the plaintiffs in error to file, in writing, by a specified time, the additional questions which it was desired to propound to Edmundson and the alleged respective answers of the various witnesses thereto. . Counsel filed a statement, from which it appeared it was desired to prove impeaching statements by five witnesses. Four of these witnesses had given testimony in the case as witnesses for plaintiffs in error, and had sworn to statements made by Edmundson as being contradictory to his statements on the stand. The alleged contradictory statement which was desired to be testified to by the other of the five witnesses had been proven by another witness before the written statement was presented. It was a matter resting in the sound discretion of the court to permit or refuse to permit the witness to be re-called under the circumstances. There was no abuse of the discretion.

Edmundson based the identification of the plaintiffs in error largely upon the view he obtained of them while they, as he testified, were entering the door of the engine house and while they were overpowering him there. He described the engine house, the lights and his position. It was contended, and proof was introduced tending to show, that Edmundson could have had but an imperfect and indistinct view of the persons standing at the door of the engine house. The court permitted testimony to be given of actual tests made by witnesses as to the view which could be had of persons and objects at and in the doorway under the conditions testified to by Edmundson. Such evidence is competent if the conditions at the time testified to by the witnesses were the same as when the burglars entered the engine room, or so nearly the same

as that the testimony would be fairly applicable to the issue.    The discrepancies in conditions, if any, were but slight, and affected the weight of the testimony,—not the competency thereof.

The plaintiffs in error Mitchell and Hauser gave testimony as witnesses in their own behalf on the trial, Mitchell being first examined.    In the cross-examination of plaintiff in error Hauser, the court required him, over the objection of his counsel, to answer whether he had testified as a witness on the preliminary hearing before the justice of the peace.    The witness answered he did not.    He was then asked if any of the other defendants testified at such preliminary hearing, and the objection to that question was overruled, but he did not answer the question.    He was then asked if any of the other defendants talked to him at the preliminary hearing, and an objection to that question was overruled and the question was repeated to the witness and was again objected to and was not answered.    There was therefore no proof that any of the plaintiffs in error other than Hauser did or did not testify at the preliminary hearing.    The plaintiff in error Hauser voluntarily elected to become a witness in his own behalf on the trial in the circuit court and testified fully before the jury.    In view of all the evidence in the case, it is clear that no such injury could have resulted to him from his answer that he did not testify at the preliminary hearing, as demands the reversal of the judgment.    The question whether any of the plaintiffs in error testified at the preliminary hearing was proper as to any plaintiff in error who did so testify, if asked as preliminary to proof of the declaration of such plaintiff in error while on the stand.

The many complaints as to alleged misconduct on the part of the attorneys for the People in the cross-examination of the defendants' witnesses are not based upon any exceptions taken at the time, except in one instance. In all other instances the court sustained the objections,

and there was no necessity for exceptions or complaint in this court. The ruling to which the exception was taken permitted the witness to state how long he had known the wife of the plaintiff in error Freeland (or Edwards.) The ground of the objection to the question was, no doubt, that it was immaterial how long he had known the wife of the said plaintiff in error, and the answer was equally immaterial and harmless.

Only two jurors were obtained to try the case on the first day of the trial. On the second morning of the trial the plaintiffs in error, who were confined in the jail in default of bail, were brought by the sheriff from the jail into the court room, before the opening of court, without having removed from their persons the shackles which he had placed on them to prevent their escape while bringing them from the jail. The two jurors who had been selected and sworn were then in the court room, as were also a number of veniremen who had been summoned to sit in the case as jurors if found qualified and acceptable to the parties. Counsel protested privately to the judge of the court, who seems also to have been in the court room, and asked that the sheriff be instructed to remove the shackles and handcuffs from the defendants, so that they would at no time be seen by the jurymen and veniremen in irons. The court made no order, and on the next morning the sheriff brought the defendants again into the court room in irons. The court had not convened, but some of the jurors who had been selected and sworn to try the case were in the room, as were also a number of unexamined veniremen. After the court had convened, counsel in open court protested, but the court declined to make any ruling in the matter. The action of the sheriff thereafter was such that no further cause of complaint existed. · It is the design of the law that a prisoner, upon his trial before a jury, shall have the unrestrained use of his limbs, and shall not be placed under any physical bonds or burdens which might tend to con-

fuse or embarrass his mental faculties. A prejudice might be created in the minds of the jury against a prisoner who should be brought before them handcuffed and shackled, which might interfere with a fair and just decision of the question of the guilt or innocence of such prisoner. For these reasons it was said by the ancient law writers: "If felons come in judgment to answer, etc., they shall be out of irons and all manner of bonds, so that their pain shall not take away any manner of reason, nor constrain them to answer but at their free will." (3 Wharton on Crim. Law, sec. 3154, note b.) Mr. Blackstone, touching the subject, said (vol. 4, 322): "He [a prisoner] must be brought to the bar without irons or any manner of shackles or bonds, unless there be evident danger of an escape, and then he may be secured with irons." There is no complaint that the plaintiffs in error were in any way so restrained, physically or mentally, by acts of the sheriff, as to be deprived of any opportunity or means of presenting their defense. The only possible ground of complaint could be that the jurors, and such of the veniremen as were afterwards selected as jurors, if any, who saw the plaintiffs in error in irons in the court room before the session of the court had begun, might have thereby been led to conceive an unfavorable impression of them and of their cause. The jurors knew the plaintiffs in error were confined in the common jail of the county and knew they must at each session of the court be brought from the jail to the court room in the charge and custody of officers, and that they must be returned to the jail at each adjournment of the court in like custody of the officers. The sheriff was responsible for the safe keeping of the prisoners, and was fully authorized to take all reasonable means and precautions to prevent them from escaping. We cannot say the sheriff was not authorized to place them in irons as a reasonable means of preventing an escape while taking them from the jail to the place of trial. That the jurors might see the prisoners thus shackled or.

handcuffed while being brought from and returned to the jail and in the custody of the officers was not improbable. It was the duty of the sheriff to remove their irons while in the presence of the court and jury convened for the trial, unless there was evident danger of an escape. These plaintiffs in error appeared at all times before the jury when any steps were being taken in their case, unshackled and unrestrained, and we do not think they were deprived of any constitutional right by the fact they were seen in irons on the two occasions by some of the jurors before the court had convened. Sheriffs must be vested with a large degree of discretion as to the necessity of restraining prisoners with handcuffs or chains while bringing them out of the jail to the place of their trial. All such irons should be removed as soon as the necessity for their use has ceased, and the courts should not permit prisoners to be unnecessarily exposed to the view of the jury in irons in the court room, even before the court is convened.

The argument indulged in by counsel for the prosecution cannot be commended. The use in an argument of coarse expressions and of words from the "slang" of the low and vicious classes may at times be justified by the character of the proof, but their use beyond the necessities of the case is not creditable to counsel nor respectful to the court and the jury. We think there was unnecessary repetition of language of this character by counsel for the prosecution, but we are unable to say that the plaintiffs in error were thereby deprived of any substantial right. Had counsel more wisely and with greater propriety chosen to express the same thoughts in more refined language their arguments would have been more seemly, and, as we believe, not less effective.

The court did not err in permitting counsel for the prosecution to exhibit the register of the New Oakwood lodging house to the jury, and to insist before them that it appeared from an inspection of the book and its leaves

that it was not a register which had been in daily and actual use in the lodging house; that the pages thereof were clean and new, and not soiled by frequent use; that the names on the register appeared to be in one hand-writing and appeared to have been made at one and the same time, and not at different times, as different guests should come to the lodging place. The view of counsel for the plaintiffs in error that only that part of the register which purported to show the names of the plaintiffs in error Hauser and Mitchell (who registered as Clark) was introduced in evidence is not correct. We think the whole book was before the jury, and that it was proper for them to look at it and all of its pages, in order to determine the truth of the claim that it was the genuine register of the said lodging house, and was worthy of consideration as tending to establish that said plaintiffs in error Hauser and Mitchell (or Clark, as he claimed his true name to be,) had lodged at that house in Louisville, Kentucky, on the night the bank was burglarized at Gardner, in Illinois.

Instruction No. 8 given at the request of the People, in reciting the names of the defendants, among others, named Edward Howell, *alias* Edward Hauser. There was no proof that Howell was the proper name of this defendant. It is urged the "moral standing of this defendant must have been seriously affected" by this manner of stating his name. He was indicted by the same names as were used in the instruction. He pleaded that he was not guilty, and did not, by any plea, urge that his name was not correctly stated in the indictment. He became estopped to deny his plea by the name charged in the indictment. (2 Hale's P. C. 175; 14 Ency. of Pl. & Pr. 300.) The jury were fully advised as to the contents of the indictment and had it with them into the jury room, as they had the instruction. In the absence of a plea of misnomer it was entirely proper to treat the defendants as properly named in the indictment.

The court ruled correctly in refusing to grant instructions Nos. 35, 37, 40 and 47 asked in behalf of the plaintiffs in error. Instructions Nos. 35 and 37, if given, would have infringed the province of the jury to determine the credibility of the witnesses and the weight and value of their testimony. The jury, in determining as to the credibility of witnesses and the value of their statements, may consider the appearance and conduct of the witnesses while on the stand. One witness may, by his frank and open manner and prepossessing appearance, convince the jury that he is truthful, unbiased, intelligent and worthy of confidence. The appearance and manner of another may indicate that he is crafty, cunning, unfair and unreliable, or lacking in judgment or discretion. That when nothing appears to the contrary the presumption is to be fairly indulged that an unimpeached witness has testified truly may be laid down as a principle derived from the experience and knowledge of mankind, but the law has no such rule which the court may lay down in the instructions to the jury. (29 Am. & Eng. Ency. of Law,—1st ed.—768.) Instruction No. 40 asked the court to charge the jury that "if any other witnesses" than those endorsed on the indictment "are to be called by the prosecution, the defendants must have written notice and the names of such witnesses furnished to them, so that the defendants or their counsel may interview all the witnesses that may appear and testify against the accused." It is within the sound discretion of the court to allow witnesses to be examined other than those whose names are endorsed on the indictment. *Gore* v. *People,* 162 Ill. 259.

There is no error in the record requiring the reversal of the judgment of conviction against either of the plaintiffs in error, and the judgments are therefore affirmed.

*Judgment affirmed.*