## UNITED STATES of America

v.

## Mark BRANTLEY, Appellant.

. No. 07–3575.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit L.A.R. 34.1 Sept. 11, 2008.

Filed: Aug. 27, 2009.

---

given the relatively low standard for admissibility under Rule 702.

**9.** Although before the District Court Richards sought sanctions under both Rule 11 and 28 U.S.C. § 1927, it presses only the denial of Rule 11 sanctions before us.

**764**

George S. Leone, Esq., John F. Ramono, Esq., Office of the U.S. Attorney, Newark, NJ, for the Appellee.

Peter M. Carter, Esq., Office of the Federal Public Defender, Newark, NJ, for the Appellant.

Before: McKEE, SMITH and WEIS, Circuit Judges.

## OPINION

McKEE, Circuit Judge.

Mark Brantley appeals his conviction and the sentence that was imposed after a jury found him guilty of unlawful possession of a firearm by a felon. As we shall explain, although we have concerns about the trial proceedings, the record does not support any relief, and we must therefore affirm the judgment of conviction and sentence.

### I.  Background

Brantley was arrested on June 3, 2005 in New Brunswick, New Jersey for being in a location that was off-limits to him under a "Drug Offender Restraining Order" ("DORO") that a New Jersey court had entered against him the previous month pursuant to New Jersey's Drug Offender Restraining Order Act ("DORO Act"), N.J. Stat. Ann. § 2C:35–5.4 *et seq.*

The arrest occurred after Police Lieutenant Paul Schuster observed Brantley "walking into the area of Lee Ave. and Handy St." Since Schuster knew that Brantley was well within the area prohibited by the DORO, he directed Detectives Christopher Plowucha and Ronoldy Martinez to arrest Brantley for violating the DORO. While arresting him, Detective Martinez handcuffed Brantley and then conducted a limited "pat down" search of his outer clothing for "any type of contraband."

Detective Martinez decided not to search Brantley more thoroughly at the time of the arrest because a crowd had gathered across the street. Rather, the Detective thought it best to quickly remove Brantley from the scene and do a more complete search at the police station. After Brantley was taken to the police station, police discovered that he was carrying a handgun, and he was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and (2).

Before the ensuing trial, Brantley filed a pretrial motion requesting an "innocent possession" jury instruction. The judge reserved decision on the motion.

For reasons that are not at all apparent on this record, Brantley was brought into the courtroom for his trial with shackles on

his ankles. The record does not reveal who made the initial decision to shackle Brantley, how that decision was made, or why it was made. However, the Assistant United States Attorney raised the issue of shackling during the trial, apparently in an effort to create a record that would support the restraint. In response, the district court noted that Brantley posed no apparent security threat. However, the judge explained, he never "second-guessed" the judgment of the United States Marshals Service, who ensure the safety of the courthouse, and Brantley remained shackled.

Before Brantley took the stand to testify in his own defense, defense counsel objected to Brantley being shackled during his testimony. The district court stated: "I'm going to make this very simple: I leave that up to the Marshals. They are the first line ... and if they want those shackles to stay on, they will stay on." However, the Deputy Marshal in the courtroom did not affirm the necessity for the restraints. Instead, he stated that he would have to "defer to [sic] a supervisor before [they] could make that decision." The district court did not allow the Deputy to consult a supervisor, and instead ruled that Brantley suffered "no unfair prejudice" by being shackled. Brantley was, thus, shackled for the duration of the trial.[1]

Brantley admitted to possessing the gun, but testified that he was headed to the police department to surrender the gun when he was arrested. He explained that he did not immediately turn over the gun because he was concerned that the police might overreact "in the chaos of the arrest." At the station, Brantley allegedly told Detective Plowucha that he wanted to "lawfully surrender a handgun to the New Brunswick police department." According to Brantley, Plowucha "was shocked" and asked Brantley where the gun was located. Brantley then lifted the back of his coat and exposed the handle of the gun that was tucked into his waistband.

As noted at the outset, the jury convicted Brantley of being a felon in illegal possession of a firearm, and the district court refused to give the requested "innocent possession" instruction. It did so because: 1) the court believed that application of the innocent possession defense to the charge of felon in possession of a firearm undermined the congressional intent of keeping guns out of the hands of felons that is reflected in 18 U.S.C. § 922(g)(1); 2) the doctrine has not been accepted in this jurisdiction; and 3) Brantley's own testimony negated the factual predicate for the defense because Brantley conceded that he made no effort to surrender the gun when he was first approached by the police.

The Presentence Report ("PSR") calculated a guidelines range of 120 to 150 months imprisonment,[2] and recommended

---

1. In an effort to prevent the jury from seeing Brantley in shackles, the district court arranged for him to be taken to and from the witness box in the jury's absence. The court also ordered two Marshals to stand near Brantley so that the jury could not see Brantley's legs or ankles as they entered the jury box. Brantley objected to both the shackles and the arrangement with the Marshals, arguing that the shackles and the Marshals' proximity suggested that he was incarcerated. The judge responded, "Mr. Brantley, you got yourself into that trouble, not me.... You

have exactly what you should have on under these circumstances. They're not coming off."

The court's response is as perplexing as it is confusing as the judge had himself earlier confirmed that Brantley's behavior and demeanor in the courtroom had been perfectly appropriate.

2. The statute, however, sets a maximum term of imprisonment of 120 months.

that Brantley not receive a two-level downward adjustment for acceptance of responsibility. Brantley argued that his sentence should be reduced because of his troubled upbringing, his drug addiction, his positive and consistent relationship with his wife and children, and because he was already serving a sentence of imprisonment. The district court denied the two-level adjustment for acceptance of responsibility because Brantley had not "truthfully admitted to his conduct." The court also rejected Brantley's arguments for leniency and imposed the maximum sentence. This appeal followed.

## II. Brantley Was Not Entitled to an "Innocent Possession" Charge

■ Brantley first argues that the district court erred in not giving an "innocent possession" charge to the jury because he took possession of the firearm only so that he could deliver it to police. *See United States v. Mason*, 233 F.3d 619, 623 (D.C.Cir.2000) (recognizing an innocent possession defense to a section 922(g)(1) charge and noting that Congress could not have intended the "absurd" result of permitting a conviction based on mere knowing possession). Brantley argues that the transitory and innocent possession of a firearm is a defense to 18 U.S.C. § 922(g)(1), and that the instruction was justified by the evidence. Appellant's Br. at 18–31.

We review the trial court's refusal to give a specific jury charge for abuse of discretion. *United States v. Leahy*, 445 F.3d 634, 642 (3d Cir.2006). As the district court recognized, this court has not ruled on the viability of the innocent possession defense in the context of a section 922(g)(1) charge. The district court concluded that the charge was not warranted by the evidence because Brantley had several opportunities to inform police that he was carrying a gun before they discovered it. We agree.

Even if we accept Brantley's testimony that he voluntarily disclosed the gun and surrendered it at the police station, it is not disputed that he was stopped on the street by police, searched, and then driven to the police station before he said anything about having a gun. He admits that he did not inform police that he had a gun at any point before reaching the station. Brantley therefore conceded that he possessed the gun longer than necessary to surrender it. *See United States v. White*, 552 F.3d 240, 249 (2d Cir.2009) (declining to decide "whether to recognize an innocent possession in the section 922(g)(1) context," but ruling that the trial court did not abuse its discretion in declining to charge the jury on the defense where defendant "failed to adduce sufficient evidence that he possessed the shotgun only for as long as necessary to vitiate a potential threat" to a third party). Thus, even assuming *arguendo* that innocent possession is a viable defense to a section 922(g)(1) charge and accepting Brantley's testimony, we cannot conclude that the district court abused its discretion in refusing to give the requested charge on this record.

## III. The Arresting Officers Properly Relied on the DORO

■ Brantley next claims that the statute authorizing the DORO that was imposed on him and that was the basis of his arrest denied him substantive due process of law by unduly restricting his movement. The DORO Act authorizes a court, upon application of a law enforcement officer or prosecuting attorney under specified circumstances, to prohibit certain persons from entering an area where the offense "occurred or is alleged to have occurred or is affected by the criminal offense with which the person is charged." N.J. Stat.

Ann. § 2C:35–5.7(a) *referencing* N.J. Stat. Ann. § 2C:35–5.6.

Brantley does not dispute that the DORO was issued by a judge, based on probable cause, and pursuant to the statute. As the government correctly notes, police officers may in good faith rely on the validity and constitutionality of laws passed by the legislature, with the "possible exception" of laws "so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see [their] flaws." *Michigan v. DeFillippo*, 443 U.S. 31, 38, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979); *see Illinois v. Krull*, 480 U.S. 340, 350–55, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987). Here, Brantley has not demonstrated that the DORO Act suffers from these infirmities. Thus, the arrest was valid, and we need not dwell on Brantley's contention that the restraining order or the underlying ordinance was unconstitutional.[3]

## IV. The Use of Shackles

Brantley's next claim is much more troubling. He argues that his Fifth Amendment right to a fair trial was violated because he was shackled during his testimony. We review the district court's decision to require a defendant to wear shackles for an abuse of discretion. *Deck v. Missouri*, 544 U.S. 622, 629, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005).

It is well-settled that shackling a defendant during trial is an extraordinary measure; "no person should be tried while shackled . . . except as a last resort." *Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).[4] As the Supreme Court more recently explained in *Deck v. Missouri*, shackling a defendant is inherently prejudicial because it implicates three fundamental legal principles: 1) the presumption of innocence; 2) the right to counsel, including the right to participate in one's defense and the right to testify[5]; and 3) judicial responsibility for the dignity and decorum that preserves the judicial process. *Deck*, 544 U.S. at 630–31, 125 S.Ct. 2007. Thus, the Court concluded, "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court deter-

---

**3.** Brantley also contends that the DORO was issued in violation of his procedural due process rights because he was never given a meaningful opportunity to present evidence to challenge any perceived necessity of issuing the restraining order, and that he was not represented by counsel when the DORO was issued. However, Brantley has failed to develop this argument. He offers nothing more than two unsupported and conclusory sentences in his brief. *See* Appellant's Br. at 38.

**4.** *United States v. Van Sach*, 458 F.3d 694, 699 (7th Cir.2006) ("Shackling a defendant is an extreme measure and we understand the prejudice that such an order can have on the jury."); *United States v. Baker*, 432 F.3d 1189, 1244 (11th Cir.2005) ("[T]he decision to use shackles to restrain a defendant at trial should rarely be employed as a security device.") (internal citation omitted); *Tyars v. Finner*, 709 F.2d 1274, 1284 (9th Cir.1983) ("Shackling . . . must be limited to cases ur-

gently demanding that action."); *Kennedy v. Cardwell*, 487 F.2d 101, 110 (6th Cir.1973) ("[T]he general rule [is] that a fair trial demands that a defendant be tried free of bonds except in extraordinary circumstances.").

**5.** Given the ignominious history and physical burden of shackles, it is no wonder that courts have long expressed concern that shackles may affect the mental state of the defendant. *See People v. Harrington*, 42 Cal. 165, 168–169 (1871) (stating that shackling "inevitably tends to confuse and embarrass [the defendant's] mental faculties, and thereby materially to abridge and prejudicially affect his constitutional rights of defense," especially regarding his ability to be a "competent witness and testify[ ] on his own behalf"); *Hauser v. People*, 210 Ill. 253, 71 N.E. 416, 421 (1904) (holding that physical bonds "might tend to confuse or embarrass [the defendant's] mental faculties").

mination ... that they are justified by a state interest specific to a particular trial." *Id.* at 629, 125 S.Ct. 2007.

Accordingly, the trial judge "must make a case specific and individualized assessment" of the defendant on trial, taking into account special security needs or the escape risk of the defendant.[6] *Baker*, 432 F.3d at 1244 (citing *Deck*, 544 U.S. at 633, 125 S.Ct. 2007). The judge must also consider alternatives to shackling. *See Allen*, 397 U.S. at 344, 90 S.Ct. 1057; *see also Szuchon v. Lehman*, 273 F.3d 299, 314 (3d Cir.2001) (holding that the trial court properly ordered that defendant be shackled after defendant violently assaulted a witness in front of the jury and after carefully considering alternatives, such as "barring [the defendant] from the courtroom or issuing a contempt citation"). "[T]he defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.'" *Deck*, 544 U.S. at 635, 125

S.Ct. 2007 (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).

Nevertheless, even though nothing on this record establishes that the district court undertook the inquiry it should have before allowing Brantley to be shackled during his trial, we can conclude beyond a reasonable doubt that Brantley's shackles did not contribute to the verdict or undermine his testimony. When he testified, Brantley admitted two of the three elements of the crime he was charged with, and he did not contest the third.[7] Brantley testified that he was a felon and admitted that he possessed the gun in question, and the government's testimony regarding interstate commerce was not disputed.[8]

To be clear, however, we are extremely troubled by the district court's decision to allow Brantley to remain shackled in the courtroom with absolutely no inquiry into the necessity for that drastic action and certainly no finding that would support it.[9] As noted above, the court stated that it would completely defer to the Marshals in

6. Many courts have laid out factors a trial court may consider in determining whether physical restraints are appropriate, some of them obvious. *See, e.g., People v. Boose*, 66 Ill.2d 261, 5 Ill.Dec. 832, 362 N.E.2d 303, 305–06 (1977). Courts have also recommended holding a formal hearing, during which the parties may present relevant evidence and suggest alternative security measures. *See, e.g., Kennedy*, 487 F.2d at 107 ("Several courts, including this one, have recognized that the physical indicia of innocence are so essential to a fair trial that the better practice is to hold a hearing so that factual disputes may be resolved and evidence of the facts surrounding the decision are made a part of the record.").

7. Although the argument is not well-developed by Brantley, the same analysis applies to his argument that the Marshals' proximity to him during his testimony may have caused the jury to infer that he was dangerous or a risk of flight. Yet, we are similarly troubled by the court's failure to recognize the risk of

prejudice that could have resulted from stationing Marshals near Brantley while he was on the witness stand.

8. The government presented testimony that the gun was manufactured in Maryland. Brantley was in New Jersey at the time of his arrest.

9. Although the AUSA attempted to justify shackling Brantley by referencing his extensive record, it is a regrettable fact that Brantley's record is no more imposing or threatening than that of many others who pass through the nation's courtrooms. Yet, countless scores of other defendants with similar or worse criminal records are tried every day without shackles and without incident. This is especially true given the high volume of cases involving drug traffickers that have become the daily fare of all too many federal trial courts. *See United States v. Navarro*, 476 F.3d 188, 191–92 (3d Cir.2007) ("Possession of a gun is often a practical prerequisite for the sale of controlled substances or commission of other violent acts.").

the courtroom. In doing so, the court abdicated its discretion, and thereby abused that discretion. *Ray v. Robinson,* 640 F.2d 474, 478 (3d Cir.1981) ("If a district court fails to exercise its discretion, that is itself an abuse of discretion.").[10] It is the judge's responsibility to ensure that defendants receive due process and fundamental fairness; it is not the job of the U.S. Marshals.

The shackling here is rendered even more troubling when we consider that the Marshals were not prepared to justify a decision to keep Brantley in shackles. When asked for their view, they requested leave to discuss the issue with their supervisor, but the court denied that request. Rather than indulge the Marshals and tolerate a brief delay to determine why shackling might be necessary, the court pressed forward requiring Brantley to suffer the inherent indignity of being shackled during his trial. The court did this based upon its conclusory finding that there was "no unfair prejudice." In the absence of a documented need for the restraint, declaring "no unfair prejudice" is hardly consistent with the court's solemn obligation of ensuring that those who come before it are treated with appropriate dignity and afforded due process. A declaration of "no unfair prejudice" is no substitute for a meaningful inquiry into the need to restrain a defendant during trial, and it cannot cure the injury that results to the decorum of the courtroom or the dignity of the individual if restraints are not actually necessary.

Furthermore, the district court's focus on obscuring the shackles from the jury's view was misguided. Visible shackles, without justification specific to the defendant, clearly violate due process. *Deck,* 544 U.S. at 629, 125 S.Ct. 2007. Although courts can take measures to obscure shackles—and should do so even in the rare circumstances that justify shackling— obscured shackles are no less an indignity than visible ones. Moreover, relief may still be appropriate even despite efforts to hide restraints from the jury. *See, e.g., Rhoden v. Rowland,* 172 F.3d 633, 637 (9th Cir.1999) (granting habeas petition based on evidence that the jury saw defendant's shackles during a trial in which the trial judge instructed defendant to keep his legs under counsel table and escorted defendant to and from the courtroom outside the jury's presence in order to hide the shackles).

---

Therefore, if shackling is justified based only upon Brantley's criminal record, very few defendants would be able to stand trial in, much less enter, the nation's courtrooms free of shackles and restraints. *See United States v. Miller,* 531 F.3d 340, 346 (6th Cir.2008) (holding "neither [defendant's] lack of honesty nor his potential prison sentence—without evidence indicating that he posed a threat to courtroom security—suffices as such an essential interest. Were we to accept the government's position ..., the implementation of physical restraints would become essentially routine in federal drug and firearm prosecutions. This is clearly beyond what the Constitution permits.").

10. *Lopez v. Thurmer,* 573 F.3d 484, 492 (7th Cir.2009) (noting that the "constitutional infirmity" of allowing law enforcement officials to make decisions implicating due process

"is, to put it mildly, firmly established"); *Miller,* 531 F.3d at 346 (holding that "[b]y deferring to the Marshals' judgment [regarding the use of a stun belt], the district court abdicated its responsibility and thus abused its discretion."); *United States v. Mayes,* 158 F.3d 1215, 1226 (11th Cir.1998) (holding that "trial judges should not blindly defer to the recommendation of law enforcement officials as to the appropriateness of shackling without independently reviewing the facts and circumstances thought to warrant such a security measure and carefully considering the legal ramifications of that decision"); *Hameed v. Mann,* 57 F.3d 217, 222 (2d Cir.1995) (holding that "[i]n determining what restraints are necessary, the court cannot properly delegate that decision to guards or other prison officials but must decide that question for itself").

Here, though the district court made many efforts to conceal them, Brantley's shackles may have been visible to jurors during at least part of his testimony. The record reflects that the witness box had spindles through which jurors may have been able to see his legs. In the middle of Brantley's testimony, after realizing the possibility that the shackles might be visible to the jury, the court decided to put a chair in front of the witness stand. As noted above, the court also placed two Marshals near Brantley in an effort to hide the shackles from the jury while they entered and exited the jury box. Though such contortions may successfully obscure shackles from the jury's view, *see United States v. Tagliamonte*, 340 Fed.Appx. 73, 79–82 (3d Cir.2009),[11] courts unnecessarily risk the defendant's fundamental right to a fair trial by relying on them.[12] It is also highly risky to assume that the same jurors whom we expect to be alert and attentive during trial will not notice the sudden and unexplained appearance of a chair in front of the jury box or Marshals standing near the defendant as he testifies.

Although Brantley is not entitled to relief, no court should take imposing restraints lightly or cavalierly. Unjustified shackling is a remnant of an earlier era when the accused was brought from prison to the courtroom in chains, unkempt and wearing (at best) prison attire, following which he was exposed to a jury in the worst possible light. The practice evokes

the dehumanizing specter of slavery, and is far from the law's promise of respect owed to each individual, including the accused. *See Allen*, 397 U.S. at 350–51, 90 S.Ct. 1057 (Brennan, J., concurring) (concluding that shackling and gagging offend "not only judicial dignity and decorum, but also that respect for the individual which is the lifeblood of the law"). It is an extreme measure, that the Supreme Court considers "a last resort." Any court considering such an extreme measure must first establish that it is actually *necessary*, not simply a matter of practice or convenience. And in making such a determination, a district judge must scrupulously "make a case specific and individualized assessment" that supports his decision to shackle a defendant and provides a reviewing court with an adequate record. There is certainly nothing convenient about requiring anyone to suffer the indignity of shackling unless his or her own conduct justifies it. We will therefore not hesitate to order a new trial for this kind of abuse of discretion in an appropriate case.

## V. The District Court Properly Denied a Downward Adjustment for Acceptance of Responsibility

■ Finally, Brantley claims that the district court erred in refusing to grant a two-level guideline reduction for acceptance of responsibility. "We review factual findings underlying the denial of a Sentencing Guidelines reduction for acceptance of responsibility for clear error. . . ." *United States v. Lessner*, 498

---

**11.** In *Tagliamonte,* a defendant was tried in shackles before the same trial judge after the judge took precautions to ensure that the shackles could not be seen by the jury. We would not expect a judge to allow defendants to be routinely shackled. Tagliamonte, like Brantley, was not able to demonstrate prejudice. Tagliamonte could not do so because it was clear that the jury did not see the shackles. As we have explained, Brantley cannot do so because his testimony virtually con-

ceded the elements of the crime he was charged with.

**12.** Moreover, courts must consider the implications of shackles on the other fundamental legal principles laid out in *Deck*, including the impact on the defendant's ability to participate in his defense and the dignity of the defendant. *See Deck,* 544 U.S. at 630–31, 125 S.Ct. 2007.

F.3d 185, 199 (3d Cir.2007). This argument is puzzling because, as the government notes, Brantley did not accept *criminal* responsibility. Rather, he vigorously argued that he did not have the *mens rea* required to commit the offense he was charged with, and adheres to that position even now. Brantley does not simply challenge the constitutionality of his arrest; instead, he has consistently maintained that he was on his way to the police station to surrender the gun when he was apprehended even though, as the district court determined and as we have explained, his own testimony fatally undermines that claim. In denying the acceptance of responsibility reduction, the district court found that Brantley had not "truthfully admitted to his conduct," and the "facts [ad]duced at trial do not support" his claim that he was attempting to return the firearm. We agree.

## VI. Conclusion

For the foregoing reasons, we will affirm the judgment of conviction and sentence.