**UNITED STATES of America,**

v.

**Marco BURTON, Appellant.**

**No. 00–2789.**

United States Court of Appeals, Third Circuit.

Argued July 24, 2001.

Filed April 29, 2002.

---

Brian J. McMonagle (Argued), McMonagle, Perri & McHugh, Philadelphia, PA, for Appellant.

Michael L. Levy, United States Attorney, Robert A. Zauzmer, Assistant United States Attorney, Chief of Appeals, M. Taylor Aspinwall (Argued), Assistant United States Attorney, Philadelphia, PA, for Appellee.

Before ROTH, BARRY and AMBRO, Circuit Judges.

## OPINION OF THE COURT

AMBRO, Circuit Judge.

Following his conditional guilty plea to the illegal possession of various firearms and narcotics, Marco Burton appeals the District Court's denial of his motion to suppress evidence based upon alleged violations of his Fourth Amendment rights. He argues that the Government arrested him without probable cause and searched his house without a warrant supported by probable cause. We affirm, though on grounds different than those of the District Court. *See United States v. Burton,* 193 F.R.D. 232 (E.D.Pa.2000). We find that Burton's arrest was justified by probable cause and that, even if it was not, the subsequent warrantless seizure of his vehicle was independently justified under either the automobile exception or the *Place* exception, see *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), to the warrant requirement. We further conclude that the warrant for the search of the house was supported by probable cause, even assuming an earlier protective sweep of the house was unreasonable under the Fourth Amendment.

## I. FACTS AND PROCEDURAL HISTORY

It is an understatement to describe January 26, 1999 as an unlucky day for Marco Burton. On that day, officers of the Philadelphia Police Department and agents of the Drug Enforcement Administration ("DEA"), in a combined effort known as the DEA Task Force (the "Task Force"), were investigating the activities of a group the Task Force named the Darien Street Drug Organization. The Task Force was using a confidential informant to purchase drugs from Melvin Santiago on the 2800 block of Darien Street in Philadelphia. Santiago was suspected by the Task Force to be a distributor of cocaine, cocaine base and heroin. The informant had been involved in a prior attempt to purchase drugs from Santiago and had previously provided intelligence to the Task Force on the Darien Street Drug Organization. While that informant attempted to purchase drugs from Santiago, he and the Task Force inadvertently interrupted what appeared to be a major drug transaction between Santiago and Burton, thereby leading to Burton's arrest on the current charges.

According to the evidence presented at the District Court's suppression hearing, the confidential informant was equipped with a microphone that permitted the Task Force to listen to his conversations as they occurred. Other members of the Task Force were stationed in a position to observe the events on Darien Street. After the informant arrived on Darien Street and queried where he might find Santiago, he was informed that Santiago was inside the house at 2851 Darien Street. The informant went to that address, where he requested to meet with Santiago but was rebuffed by persons outside the residence. Those persons told him that Santiago was busy conducting business and that he should wait. Loathe to linger outside for more than a few minutes on a cold January afternoon, the informant knocked at the entrance to the residence and again requested an audience with Santiago. Santiago appeared at the door and told him to continue waiting. During that encounter the informant saw stacks of money being

counted inside the residence. He later informed the Task Force that he observed one Hispanic male and one African American male meeting with Santiago.

After being denied entrance, the informant was told by the individuals outside the residence that Santiago was involved in a "five brick" deal involving "big money" with a "big boy." Following a lengthy wait, during which he related to the Task Force what he saw inside 2851 Darien Street, the informant eventually was able to negotiate with Santiago a price for an ounce of cocaine. Santiago instructed an associate to sell it to the informant at another location, presumably to avoid disturbing the larger transaction taking place inside. The sale occurred shortly thereafter.

Over forty minutes elapsed during the informant's attempt to purchase drugs from Santiago. At the end of that period, Task Force officers in a surveillance van observed an African American male, later identified as Marco Burton, exit 2851 Darien Street with an opaque plastic bag, place the bag in the trunk of a black Nissan Maxima, make a cellular phone call, and drive away.[1] Santiago also left shortly thereafter.

The Task Force agents followed the Maxima for several blocks and eventually requested assistance. Officer Dennis Bauer, a veteran officer of the Philadelphia

Police Department on routine patrol in a marked police vehicle, responded and followed the Maxima to the 2500 block of North Garnet Street. Burton parked the Maxima on that block and began walking down the street. With his firearm drawn, Officer Bauer approached Burton and instructed him to stop. Burton stuck his hand in his jacket, as if he "might have a gun," in the words of Officer Bauer, and then continued for three to five steps. At that point, as various Task Force officers reached the scene, Burton stopped and put his hands up. Officer Bauer conducted a pat down search and requested identification. Burton was initially evasive and refused to give Officer Bauer his name or address. He had no identification, but told officers he lived at various addresses in the area. Eventually, Burton gave his name and admitted he lived at 2543 North Garnet Street with his grandmother.[2] He could produce no registration or other documentation for the car, instead explaining that he had "just picked the car up." Following this initial conversation, Officer Bauer placed Burton in the back of his police car, where Burton waited while the Task Force continued their investigation on North Garnet Street. Task Force officers checked both the license plate number and vehicle identification number on the Maxima; neither was listed in Burton's name. They also requested a drug-sniffing dog to inspect the Maxima.

---

1. While the District Court's opinion only mentions Burton, it appears from the testimony at the suppression hearing and from Officer Daniel McEwen's affidavit, submitted in support of the search warrants, that there was a male passenger in the Maxima with him. The role of this anonymous passenger cannot be discerned from the record and neither party ascribes any significance to his participation in the events of that day.

2. The McEwen affidavit also recounts an evasiveness with respect to whether Burton resided at 2543 North Garnet Street, but does

so differently. It notes that "[o]ne individual initially stated that he resided at 2543 N. Garnet Street, later he retracted that he resides at that location." Because it is more detailed and presented an opportunity to be tested upon cross-examination, the District Court appears to have credited the testimony given at the evidentiary hearing that Burton was initially evasive in answering where he resided, but eventually admitted the location of his domicile. *See Burton*, 193 F.R.D. at 236.

Meanwhile, Officer Bauer noticed a man, later identified as Maurice Smith, peeking from a second floor window of Burton's purported address. While looking from a window is not ordinarily suspicious behavior according to Bauer, he characterized the observant's behavior as "real strange" because he was "peeking out" of the window rather than "com[ing] very close to the window," as most bystanders would do. Officer Bauer called the Task Force's attention to Smith and two DEA agents proceeded across the street to that address. They called to Smith and he eventually stepped out onto the building's stoop to speak with the Task Force agents. Smith talked to the agents for fifteen minutes, during which time he told them that he stayed at 2543 North Garnet Street "sometimes" and identified "Marco" as living at the house. Eventually, Smith acceded to the agents' request to look inside the house to ensure that he was its only inhabitant. While quickly surveying the interior of the house and finding no one else, the Task Force agents discovered, in plain view, drug paraphernalia—including a scale, plate, razor blade and box of baking soda, all covered in a white residue believed by the agents to be cocaine. The officers left the property and continued to converse with Smith. After Burton had spent thirty to forty-five minutes in the back of the police vehicle, the canine unit arrived on the scene. The trained drug-sniffing dog examined the Maxima and alerted to its trunk. Based on the information established up to this time, the Task Force sought search warrants for both the Maxima and 2543 North Garnet Street. In a signed affidavit, Philadelphia Police Officer Daniel McEwen, who was assigned to the Task Force, recounted many of the facts noted above, including the investigation on Darien Street, the pursuit and seizure of Burton, the quick search of the North Garnet Street house and the dog's alert to the Maxima. He also included various facts relating to his knowledge of drug trafficking in general, including a recitation of how drug traffickers use "stash houses" to store drugs, drug proceeds, firearms and related evidence.

Based on the information contained in the McEwen affidavit, both search warrants were approved. The Task Force executed the warrants and discovered $45,608 and a Ruger 9mm handgun in the trunk of the Maxima. After searching the North Garnet Street residence, the Task Force discovered a package containing 742 grams of cocaine under a bed. Another handgun and a second package containing 7.9 grams of cocaine were discovered between the mattress and box spring of the second floor bedroom from which Smith had been observing the events unfolding on North Garnet Street.

On the basis of this evidence, Burton was indicted for one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1), and a second count of possession with intent to distribute cocaine base, in violation of the same statute. He was also charged with three firearms counts, including a count of possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c), and two counts of being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1). He pleaded guilty to all five charges, but did so conditionally under Federal Rule of Criminal Procedure 11(a)(2) to preserve appellate review of the denial of his motion to suppress.[3]

Burton argues on appeal that both search warrants were invalid because they rested on illegally-obtained evidence. He

---

**3.** The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. Our appellate jurisdiction is based on 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

does not challenge the facts found by the District Court. Instead, Burton contends that those facts establish that he was arrested without probable cause and that, as a result of his arrest, the Task Force searched the Maxima. This constitutional violation, he argues, is properly remedied by excising Paragraph Nine[4] of the McEwen affidavit (which recounts the dog-sniffing of the car) from the evidence submitted in support of a search warrant for the Maxima. Similarly, Burton argues that the Task Force lacked a warrant or valid consent to search his residence and that the fruits of this unlawful search, including the drug paraphernalia evidence recounted in Paragraph Eight[5] of the McEwen affidavit, should not be considered in evaluating whether there was probable cause to issue a search warrant for the property. Burton contends that without these paragraphs the McEwen affidavit does not contain sufficient evidence to support search warrants for both the Maxima and 2543 North Garnet Street. Because he does not challenge the District Court's findings of fact and instead only argues that the Court erred in finding probable cause on those facts, we afford plenary review to Burton's claims of error. *See Ornelas v. United States*, 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

## II. PROBABLE CAUSE TO ARREST BURTON

Burton challenges the seizure of his person by Officer Bauer and the Task Force, arguing that he was arrested without probable cause. The Government responds that Burton was not arrested until the police canine unit alerted to the presence of narcotics in the trunk of the Maxima. The intervening seizure, they argue, was nothing more than a permissible *Terry* stop supported by the Task Force's reasonable, articulable suspicion of illegality. *See Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The District Court agreed with the Government. *Burton*, 193 F.R.D. at 237. It found that even though Burton was handcuffed in the back of a police vehicle for the better part of an hour, the nature and duration of the seizure did not cause the *Terry* stop to ripen into an arrest. *Id.* at 240–41.

We need not address whether the District Court correctly concluded that Burton's seizure was "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time," *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (discussing the outlines of permissible *Terry* stops), because we conclude that the Task Force had probable cause to arrest Burton at the time he was initially stopped, based on the information taken from the confidential informant and observed by the officers on Darien Street. Given our finding that the police had probable cause, we have no reason to decide whether the Task Force acted permissibly

---

4. Paragraph Nine states the following:

> 9. The officers/agents secured the residence and the Maxima. A Philadelphia Police Department canine officer and his dog arrived at the location. The canine alerted to the trunk of the Maxima. . . . This canine has been in service for the past three years as a drug detection dog and has been involved in over 100 drug investigations. This canine has alerted to positive indications which have resulted in the discovery and seizure of drugs.

5. Paragraph Eight states the following:

> 8. Based upon their security concerns and to determine whether there were other individuals inside 2543 N. Garnet Street, the officers/agents conducted a security sweep of the residence. During this sweep, the officers observed in plain view in the second floor front bedroom drug paraphernalia, including scales, baking soda, razors, and a white powdery substance.

under *Terry. United States v. Massac,* 867 F.2d 174, 177 (3d Cir.1989) (propriety of alleged *Terry* stop need not be reached if police possessed probable cause to arrest). Furthermore, we conclude that the Task Force had independent justification for the search of the Maxima under two exceptions to the warrant requirement: the "automobile exception" for warrantless searches and the *Place* exception for temporary seizures. Given these lawful independent rationales, the canine unit's inspection results were not the fruit of the poisonous tree of Burton's arrest.

■ The events on Darien Street, to which the Task Force was both an eyewitness and, for lack of a better term, an "earwitness," gave the Task Force probable cause to arrest Burton without a warrant. "Law enforcement authorities do not need a warrant to arrest an individual in a public place as long as they have probable cause to believe that person has committed a felony." *United States v. McGlory,* 968 F.2d 309, 342 (3d Cir.1992) (citing *United States v. Watson,* 423 U.S. 411, 421, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976)). The Supreme Court has explained that probable cause is a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The Court has explained the standard as

> whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.

*Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). We have stated that this standard "requires more than mere suspicion; however, it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." *Orsatti v. New Jersey State Police,* 71 F.3d 480, 482–83 (3d Cir.1995).

We have previously found probable cause even in the absence of the actual observance of criminal conduct when a prudent observant would reasonably infer that a defendant acted illegally. *See Gates,* 462 U.S. at 243 n. 13, 103 S.Ct. 2317 ("probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity"). For example, in *United States v. McGlory* we found that the observation of a transfer of money to a known drug dealer in certain circumstances was sufficient evidence to establish probable cause to arrest. *McGlory,* 968 F.2d at 342.

■ We find this case to be similar. The Task Force was aware that its informant had been told a "five brick" deal was taking place inside 2851 Darien Street. The informant actually observed a large sum of cash being counted and confirmed the involvement of Santiago, a known drug dealer. The significant amount of time taken presumably to count the money and the secrecy that attended the transaction (as evidenced by Santiago's refusal to let the informant enter the premises) supported the inference that a drug transaction was taking place. Furthermore, the informant was actually able to purchase cocaine, at a price negotiated with Santiago, that afternoon from one of his lieutenants. We have no doubt that a reasonably prudent spectator of these events would conclude, as the Task Force did, that a significant drug transaction was taking place involving Santiago and the two other men, one African American and one His-

panic, observed within 2851 Darien Street. While Burton's association with known drug dealers is insufficient, by itself, to support probable cause, *United States v. Harris,* 482 F.2d 1115, 1118 (3d Cir.1973) (fraternization with drug dealers itself insufficient to establish probable cause without other interrelated facts), the significant accumulation of evidence supporting a drug transaction justified a reasonable inference that a felony was being committed. Moreover, we must view these facts through the lens of the Task Force's significant experience with similar transactions. *See Ornelas,* 517 U.S. at 696, 116 S.Ct. 1657 (probable cause should be "viewed from the standpoint of an objectively reasonable police officer"); *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) ("the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement"). From the perspective of an experienced law enforcement officer, or indeed from the perspective of any reasonably prudent observant of these activities, it was evident that Burton was involved in a drug transaction.

In his briefing to this Court, Burton argues that the knowledge possessed by Officer Bauer when arresting him was insufficient to establish probable cause. It is well established, however, that the arresting officer need not possess an encyclopedic knowledge of the facts supporting probable cause, but can instead rely on an instruction to arrest delivered by other officers possessing probable cause. "[A]n officer can lawfully act solely on the basis of statements issued by fellow officers if the officers issuing the statements possessed the facts and circumstances necessary to support a finding of the requisite basis." *Rogers v. Powell,* 120 F.3d 446, 453 (3d Cir.1997) (citing *United States v.*

*Hensley,* 469 U.S. 221, 232, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)). Because we conclude that the Task Force possessed sufficient facts to support probable cause to arrest Burton when they radioed for assistance, we have no doubt that the resulting seizure of him by Officer Bauer was reasonable and proper.

### III. The Seizure And Search of The Maxima

Burton has not explained the connection between his arrest and the canine sniffing of the Maxima or, more specifically, why evidence obtained from his vehicle is the "fruit of the poisonous tree" of his arrest. *See Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Instead, he argues simply that there is a temporal relationship between the arrest, the seizure and the search, and describes the events of that day as "an unbroken chain of events."

The Supreme Court has held that the scope of the exclusionary rule is determined by "whether, granting establishment of the primary illegality, the evidence to which ... objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun,* 371 U.S. at 488, 83 S.Ct. 407 (citation omitted). This Court has restated the *Wong Sun* standard as two separate inquiries; namely,

(a) the proximity of an initial illegal custodial act to the [acquired evidence]; and

(b) the intervention of other circumstances subsequent to an illegal arrest which provide a cause so unrelated to that initial illegality that the acquired evidence may not reasonably be said to have been directly derived from, and thereby tainted by, that illegal arrest.

*Pennsylvania ex rel. Craig v. Maroney,* 348 F.2d 22, 29 (3d Cir.1965). The first inquiry assesses the measure of attenuation between illegal police conduct and the evidence allegedly exploited from it. Justice Powell, concurring in *Brown v. Illinois,* 422 U.S. 590, 609, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), recognized that this assessment is "largely a matter of degree" and invariably fact-specific. The second inquiry concerns whether an independent source exists for that evidence. See *Murray v. United States,* 487 U.S. 533, 537, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) (discussing the relationship between the fruit of the poisonous tree doctrine and the independent source doctrine). We have explained that, "under the independent source doctrine, evidence that was in fact discovered lawfully, and not as a direct or indirect result of illegal activity, is admissible." *United States v. Herrold,* 962 F.2d 1131, 1140 (3d Cir.1992) (emphasis in original).

Because Burton parked the Maxima and walked away from it before being seized, we have difficulty fathoming how the canine sniff is the result of the exploitation of his allegedly illegal arrest. Perhaps the best argument on this point for Burton, though based on raw conjecture, is that the Task Force effectively seized[6] the Maxima when arresting him, thereby preventing him from departing the scene by that means. *Cf. Illinois v. McArthur,* 531 U.S. 326, 333, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) (assuming officers' warrantless exclusion of a suspect from his real property was a seizure of that property for Fourth Amendment purposes). But Burton does not argue that he intended to use the Maxima had he not been seized, and thus this conjectural argument goes nowhere.

▮ Yet even if we assume, *arguendo,* that the canine sniff of the Maxima was a result of the exploitation of Burton's allegedly unlawful arrest, we nonetheless cannot conclude that what ultimately turned up (the money and the gun in the trunk) should be suppressed as fruit of the poisonous tree because the Task Force had a lawful independent source for that search. Because the Task Force observed Burton leave what they thought to be a drug deal and place the results of that transaction in his trunk, probable cause existed to conclude that the Maxima itself was involved in an illegality, regardless of Burton's seizure. The automobile exception to the warrant requirement permits law enforcement to seize and search an automobile without a warrant if "probable cause exists to believe it contains contraband." *Pennsylvania v. Labron,* 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996). While a seizure or search of property without a warrant ordinarily requires a showing of both probable cause and exigent circumstances, the "ready mobility" of automobiles permits their search based only on probable cause. See *Maryland v. Dyson,* 527 U.S. 465, 466–67, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999); *Labron,* 518 U.S. at 940, 116 S.Ct. 2485; *United States v. Ross,* 456 U.S. 798, 809, 102 S.Ct. 2157,

**6.** We speak here of the "seizure" of the vehicle and not the search of it because the police did not search Burton's vehicle before obtaining a warrant. Burton parked the car on North Garnet Street and exited it before he was arrested. Thus, even if the Task Force had not arrested Burton, the Maxima would have remained parked on the street. In these circumstances, walking a dog around the outside of the vehicle is not a search. See *City of Indianapolis v. Edmond,* 531 U.S. 32, 40, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) ("The fact that officers walk a narcotics-detection dog around the exterior of each car ... does not transform the [initial] seizure [of the car] into a search."); *Place,* 462 U.S. at 707, 103 S.Ct. 2637 (canine sniff not a search).

72 L.Ed.2d 572 (1982). Given the events on Darien Street previously recounted, probable cause existed to believe the Maxima contained contraband.

In this context, when the Task Force interdicted Burton on North Garnet Street, it had probable cause to search the Maxima immediately. Yet it did not do so. Instead, out of caution the Task Force, at most, seized the Maxima until a drug sniffing dog could be found to confirm what was already suspected to be true: that it contained contraband. Following the dog's alert, the Task Force sought a search warrant. As the Supreme Court explained, "[f]or constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." *Chambers v. Maroney*, 399 U.S. 42, 52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). In this case, the Task Force took the former course—it seized the Maxima pending a canine inspection and the subsequent issuance of a warrant. Nonetheless, it could just have easily taken the latter course and immediately searched the vehicle. Given this independent authority to search the Maxima, separate and apart from the authority to arrest Burton,[7] we believe that the Task Force had an independent source for its seizure of the evidence inside it. Because that evidence has an independent source, "exclusion of . . .

[it] would put the police in a worse position than they would have been in absent any error or violation." *Nix v. Williams*, 467 U.S. 431, 443, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Such a result is inconsistent with the goal of the exclusionary rule, *i.e.*, to put the police in the same position they would have been but for the illegality. *Id.*

■ For the sake of completeness, we also note that, even if we erred in our prior conclusions, the temporary seizure of the Maxima pending a canine inspection was still reasonable. Burton himself concedes that the Task Force possessed a reasonable, articulable suspicion to stop him on North Garnet Street. The District Court so concluded, *Burton*, 193 F.R.D. at 237, and Burton does not contest this holding on appeal. If the Task Force had a reasonable, articulable suspicion that Burton was involved in criminal acts based on his actions on Darien Street, it also had a similar suspicion that his vehicle hid the proceeds of that criminal behavior.

In this circumstance, the Supreme Court has held that police may temporarily seize an item based on "specific and articulable facts warranting a reasonable belief that" it contains contraband. *Place*, 462 U.S. at 703, 103 S.Ct. 2637. In *Place*, the police seized luggage for ninety minutes based on officers' suspicions, though not rising to probable cause, that it contained drugs. *Id.* at 699, 103 S.Ct. 2637. The Court concluded that ninety minutes was an unreasonable period of time for seizure given

---

7. As an aside, while we realize that the Government has not argued that it arrested Burton prior to the canine sniffing of the Maxima, another arrow may be in its quiver. It might have argued that it was entitled to conduct a search of the Maxima's interior incident to Burton's arrest under *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), because he had parked his car shortly before being apprehended. Last term, the Supreme Court accepted certiorari to address the relevancy of the search incident to arrest rationale in situations in which the defendant was arrested near a parked vehicle, but did not decide the case because it lacked appellate jurisdiction. *See Florida v. Thomas*, 532 U.S. 774, 776, 121 S.Ct. 1905, 150 L.Ed.2d 1 (2001). In the context of our decision today, we need not address this question.

the officers' lack of diligence in securing a drug sniffing dog. *Id.* at 709, 103 S.Ct. 2637. We have upheld seizures under *Place* lasting as long as eighty minutes when the police acted diligently to bring a trained dog to the seized property. *See United States v. Frost,* 999 F.2d 737, 742 (3d Cir.1993).

Here the amount of time necessary was only thirty to forty-five minutes, and we have no indication that the Task Force proceeded less than diligently in its attempt to bring the canine unit to North Garnet Street. Thus, given the seizure's minimal temporary intrusion on Burton's ability to exercise dominion over his vehicle, the pre-warrant seizure of the Maxima was justified under the *Place* exception.

In sum, we disagree that the evidence resulting from the search of the Maxima should be suppressed. The Task Force possessed probable cause to arrest Burton at the time it took him into custody. Moreover, because the seizure of the Maxima was lawful under both the automobile exception to the warrant requirement and the *Place*-exception (and information relating to the canine sniff was an admissible part of the McEwen affidavit seeking a warrant to search the Maxima to the extent it was even necessary to obtain a warrant), the Task Force had sanctioned sources for the evidence eventually derived from the vehicle. Hence we will not suppress that evidence.

## IV. The Search of The House.

We know well that a search warrant, supported by probable cause, is normally necessary before law enforcement may lawfully search a person's property. Searches of a home without a warrant are presumptively unreasonable under the Fourth Amendment. *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). In this case, the Gov-

ernment concedes that the Task Force lacked a warrant for its initial self-described "protective sweep" of the interior of 2543 North Garnet Street. The Government points out, however, that "[i]t is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The consent in this case, the Government asserts, was that of Smith, who is claimed to have had common authority over the property. *See Illinois v. Rodriguez,* 497 U.S. 177, 186, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (holding that a warrantless search does not violate the Fourth Amendment if police officers conclude reasonably, although incorrectly, that the person giving consent has common authority over the premises).

Burton argues that Smith could not give a valid consent to permit the Task Force to search 2543 North Garnet Street because he admitted he only stayed there "sometimes" and that the house belonged to "Marco." Thus, Burton concludes that the Task Force's initial warrantless search of the property violated his Fourth Amendment rights and the results of that search—namely, the drug paraphernalia observed and recounted in the McEwen affidavit—should have been excised from the Magistrate's consideration when finding probable cause to issue a warrant for a second, more thorough search of the property.

We need not decide whether Smith could validly give consent to the search of the property because we conclude that even if Paragraph Nine is excised, the Magistrate Judge still possessed sufficient evidence from the McEwen affidavit to find probable cause supporting a search warrant for the property. Thus, the evi-

dence gathered during that second search need not be suppressed.

■ "It is settled law in this court that, even assuming that some factual averments in the affidavit are tainted, they do not vitiate a warrant which is otherwise validly issued upon probable cause reflected in the affidavit." *United States v. Johnson*, 690 F.2d 60, 63 (3d Cir.1982); *see also Franks v. Delaware*, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Therefore, even if the drug paraphernalia evidence was illegally obtained, an issue we do not decide, the search warrant need not be invalidated if the other evidence in the McEwen affidavit independently would have established probable cause to search the house. *Johnson*, 690 F.2d at 63; *Herrold*, 962 F.2d at 1138.

■ With this backdrop, we must resolve whether the McEwen affidavit, without Paragraph Eight's recitation of the Task Force's discovery of drug paraphernalia on the second floor, contains sufficient information to support a finding of probable cause to search the North Garnet Street residence. We conclude that it does. To find probable cause to search, there needs to be a "fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238, 103 S.Ct. 2317. Because this inquiry focuses on the relation of criminal conduct to a particular location and not on the activities of any particular person, "probable cause to arrest does not automatically provide probable cause to search the arrestee's home." *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir.1993). That is not to say that those facts establishing probable cause to arrest are irrelevant to probable cause to search the arrestee's house. "If there is probable cause to believe that someone committed a crime, then the likelihood that that person's resi-

dence contains evidence of the crime increases." *Id.* at 1055–56.

■ Under our precedent, direct evidence linking the residence to criminal activity is not required to establish probable cause. *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir.2001); *United States v. Whitner*, 219 F.3d 289, 297 (3d Cir.2000); *United States v. Conley*, 4 F.3d 1200, 1207 (3d Cir.1993); *Jones*, 994 F.2d at 1056. "While ideally every affidavit would contain direct evidence linking the place to be searched to the crime, it is well established that direct evidence is not required for the issuance of a search warrant." *Jones*, 994 F.2d at 1056. Instead, probable cause to search can be based on an accumulation of circumstantial evidence that together indicates a fair probability of the presence of contraband at the home of the arrested. As explained in *Jones*, probable cause "can be, and often is, inferred by 'considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide stolen property.'" *Id.* (quoting *United States v. Jackson*, 756 F.2d 703, 705 (9th Cir.1985)).

■ Considering these factors, we are convinced that the evidence contained in the McEwen affidavit, even after excising the challenged paragraph, is sufficient to establish probable cause to search 2543 North Garnet Street. Our Court, and several other courts of appeals, "have held that evidence ... is likely to be found where the [drug] dealers reside." *Whitner*, 219 F.3d at 297–98 (listing cases). As we explained in *Whitner*,

> evidence associated with drug dealing needs to be stored somewhere, and ... a dealer will have the opportunity to conceal it in his home. After all, a dealer logically could conclude that his residence is the best, and probably the

only, location to store items such as records of illicit activity, phone books, address books, large amounts of cash, assets purchased with proceeds of drug transactions, guns to protect drugs and cash, and large quantities of drugs to be sold.

*Whitner,* 219 F.3d at 298; *see also Hodge,* 246 F.3d at 306 ("It is reasonable to infer that a person involved in drug dealing on such a scale would store evidence of that dealing at his home."). Of course, even though we have recognized that it is a reasonable inference to conclude that drug dealers often store evidence of drug crimes in their residences, application of this inference is based on evidence supporting three preliminary premises: (1) that the person suspected of drug dealing is actually a drug dealer; (2) that the place to be searched is possessed by, or the domicile of, the dealer; and (3) that the home contains contraband linking it to the dealer's drug activities. In this case evidence on each premise is profuse.

For the reasons announced in concluding that the Task Force had probable cause to arrest Burton, the Task Force also had probable cause to believe that he was a drug dealer. *See Hodge,* 246 F.3d at 307 ("probable cause existed to arrest him on drug-related charges . . . again making it more likely that drug-related evidence would be stored at his home"). The McEwen affidavit recounts all of the facts supporting probable cause to arrest, including the informant's observation of the counting of a large amount of cash and the indications that Burton and Santiago, a known drug dealer, were involved in a "five brick" deal. *See Whitner,* 219 F.3d at 298 (association with a known drug dealer supports probable cause that the defendant is involved in the drug trade). Given this quantity of narcotics (the Task Force believed "five brick" to be a street term for 1000 grams), it was reasonable to infer that Burton was a drug dealer and not simply a user. *See Hodge,* 246 F.3d at 306; *Whitner,* 219 F.3d at 298. Were the evidence supporting probable cause insufficient, it should also be remembered that we have concluded that the canine sniff of the Maxima was an admissible component of the McEwen affidavit and also supports the inference that Burton recently engaged in a transaction involving a large quantity of drugs.

■ Ample evidence existed that 2543 North Garnet Street was Burton's residence. Not only did Burton tell Task Force officers that he lived at that property with his grandmother, but Smith independently confirmed that the house was "Marco's." Both of these facts are contained within the McEwen affidavit and support the inference that the address was Burton's home. *See Whitner,* 219 F.3d at 298. More importantly, the best evidence that the North Garnet Street property was Burton's was that he parked his Maxima in close proximity to the house. *See Jones,* 994 F.2d at 1057 (the presence of defendants' residences near scene of crime supports inference that the homes would be repositories of evidence).

■ Of course, Burton's travel from Darien Street to North Garnet Street does not simply support the inference that Burton's home was on that street, but tellingly indicates that his home was the destination for the illegal proceeds of his drug transaction. While we generally accept the common sense proposition that drug dealers often keep evidence of their transactions at home, *see Whitner,* 219 F.3d at 297–98, that inference is much stronger when the home is the first place a drug dealer proceeds following such a transaction. Moreover, the McEwen affidavit relates that Burton was evasive about telling the Task Force his address. His equivocation under questioning on a subject Burton presumed to know readily

suggests he was attempting to deceive the Task Force of his true address, thereby supporting the inference that contraband was hidden there. *See Whitner,* 219 F.3d at 298–99 ("This type of suspicious and deceptive response to questioning leads to a reasonable inference that Whitner was attempting to conceal the existence of the apartment and his association with the apartment."). Lastly, the McEwen affidavit also contained the experiences of Officer McEwen, a five-year veteran of the Task Force, that "[p]ersons involved in large-scale drug trafficking and those who assist them frequently conceal in locations known as 'stash-houses' caches of drugs, drug paraphernalia, firearms, large amounts of currency," and other evidence of drug dealing. His affidavit suggests, based on his experience and training, that 2543 North Garnet Street was such a stash house. Given the evidence possessed by the Task Force and taken in light of Officer McEwen's training and experience, we believe his conclusion to be well supported, even without resort to the drug paraphernalia discovered in the Task Force's earlier quick sweep of the property.

Because the Government proffered sufficient evidence in the McEwen affidavit that there was a "fair probability that contraband," *Gates,* 462 U.S. at 238, 103 S.Ct. 2317, would be found at 2543 North Garnet Street, the warrant was validly sought and approved, and we will not suppress the evidence that resulted from the search of that property.

## V. Conclusion

The District Court properly denied Burton's motion to suppress. Thus, his conviction is hereby affirmed.