UNITED STATES of America

v.

**Richard TAGLIAMONTE also known as Sid R. Bass also known as Lawrence Waterson also known as Seraphin Colon also known as E. Munoz also known as Richard Munoz also known as Richard Martinez also known as Jose Maldonado also known as Emilio Negron also known as Richard Maldonado Richard Joseph Francis Tagliamonte, Appellant.**

No. 07–4275.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) July 17, 2009.

Filed: Aug. 10, 2009.

George S. Leone, Esq., John F. Romano, Esq., Office of United States Attorney, Newark, NJ, for United States of America.

Timothy M. Donohue, Esq., Arleo, Donohue & Biancamano, West Orange, NJ, for Appellant.

Before: RENDELL, FUENTES and ROTH, Circuit Judges.

OPINION OF THE COURT

RENDELL, Circuit Judge.

In this appeal from the judgment and sentence of the District Court, entered after a six-day jury trial, Appellant Richard Tagliamonte asks the Court to overturn his conviction under various federal anti-fraud provisions and to reduce his prison term of 180 months. Tagliamonte attacks his conviction on four grounds, asserting that: (1) the government improperly relied on evidence seized in violation of his Fourth Amendment rights to procure a search warrant for his apartment; (2) his Speedy Trial Act rights were violated by the government's delay in filing the indictment; (3) his appearance before the jury in leg restraints deprived him of a fair trial; and (4) he was prejudiced by the government's disclosure, on the eve of tri-

al, of his incriminating statements to a government official. Tagliamonte also challenges his sentence, which exceeded the applicable Guidelines range, as unreasonable. The District Court carefully considered—and rejected—these arguments in a thoughtful analysis. We find no error in the Court's conclusions and thus will affirm the judgment and sentence entered.[1]

## I. Factual Background

Tagliamonte's core contention—that the search warrant procured for his apartment included unlawfully obtained information—focuses our attention on the warrant affidavit. Unless otherwise noted, the factual summary below reflects the allegations in that document.

In December 2003, Chase Manhattan Bank ("Chase") provided federal investigators with a financial crimes investigative fraud report, indicating that Chase had issued a Visa credit card based on a possibly fraudulent credit card application. Chase reported that it had issued a Visa Card with the last four digits 8171 ("Chase Card # 8171") in the name of Sid Bass/ Bass Capital Holdings to an address in Weehawken, New Jersey. Chase suspected that the credit card application was fraudulent because the applicant's home address was in a different state than the Chase client sharing the applicant's name, Sid Bass, a known Texas billionaire. Chase Bank also alerted federal investigators to three fraudulent checks drawn on an account belonging to Sid Bass, which were used to pay balances on Chase Card # 8171.

The financial crimes investigative report also indicated that approximately $4,000 in suspected unauthorized charges had been made on Chase Card # 8171 at businesses in Northern New Jersey and New York City, and that Chase Card # 8171 had been used to pay a parking summons in New York City. After obtaining the license plate of the vehicle linked to the parking summons, federal investigators discovered that the car, a white Chevy Malibu with Tennessee license plates, had been rented from Alamo Car Rental in New York City, also using Chase Card # 8171. The renter subsequently cancelled and substituted Chase Card # 8171 with a Chase Visa Card with the last four digits # 1129 ("Chase Card # 1129"), which was also in the name of Sid Bass/Bass Capital Holdings.

Using the license plate information from the Alamo car, federal investigators discovered that the car had been stopped by police in Weehawken, New Jersey in December 2003. At that time, the driver had presented a Texas driver's license in the name of Sid Bass. The location of the police stop was in the same geographic vicinity as businesses that had reported unauthorized charges with the suspected fraudulent credit cards. Investigators also discovered other tickets issued to the Alamo car in the Weehawken area.

Based on this information, federal investigators collaborated with law enforcement in Weehawken, New Jersey to locate the Alamo car and, on January 14, 2004, law enforcement spotted the vehicle in front of an apartment building at 169 20th Street. Seeing an individual attempting to enter the vehicle, they promptly arrested the subject, who identified himself as Richard Martinez but refused to provide his home address.

---

1. The District Court exercised jurisdiction under 18 U.S.C. § 3231. We exercise jurisdiction over Tagliamonte's appeal from his judgment of conviction and sentence under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), respectively.

On the subject's person, law enforcement discovered Chase Card # 8171 and a Chase Visa Card with the last four digits # 8189 in the name of Laura Bass / Bass Capital Holdings. Officers also recovered an American Express Card in the name of Sid Ricardo Bass, which police later discovered was counterfeit, and a post-it note with three account numbers, later discovered to be Nieman Marcus, Bergdorf Goodman, and Bank of America accounts held by Sid Bass and Sid Bass's wife, Mercedes Bass.

After locating and interviewing the superintendent of the building at 169 20th Street, where the Alamo rental car was parked, federal investigators discovered that the individual in the photograph on the Texas driver's license lived in Apartment 4 of the building, and that the landlord of the unit was Lorenzo Pena. Pena informed investigators that the apartment was rented under the name Richard Munoz. The defendant contends that police proceeded to search his apartment for two hours without a warrant—an allegation the government vigorously denies.

Although Tagliamonte identified himself as Richard Martinez upon his arrest, and as Emilio Negron in his initial appearance before the Court, an FBI fingerprint check associated his fingerprints with the name Richard Joseph Tagliamonte, plus various other aliases; it did not associate him, however, with the names Sid Bass, Emilio Richard Negron, or Richard Martinez.

As part of their investigation, federal law enforcement also learned that fraudulent credit cards were being sent to an address in Weehawken, New Jersey, a vacant multifamily building. In one of the unlocked mailboxes in the building, law enforcement discovered pieces of mail addressed to Sid Bass / Bass Capital and L. Bass from Chase Bank and American Express.

Relying on the foregoing information, the government procured a search warrant for Tagliamonte's apartment on January 15, 2004, the day after his arrest. In the ensuing search of the apartment, investigators discovered fraudulent credit cards, checks, and identity documents.

Following his indictment for fraud, in violation of 18 U.S.C. §§ 513(a), 1343, 1028(a)(3), and 1029(a)(2), (3), Tagliamonte moved to suppress evidence allegedly seized from his apartment in violation of his Fourth Amendment rights, and to dismiss certain counts of the indictment, based on alleged violations of the Speedy Trial Act. The District Court denied both motions. Tagliamonte was convicted on all counts charged and sentenced to 180 months' imprisonment, a term that exceeded the applicable Guidelines range of 84 to 105 months. This timely appeal followed.

## II. Fourth Amendment Violations

Tagliamonte's first contention is that the District Court was required, but failed, to conduct an evidentiary hearing on his motion to suppress evidence obtained in violation of his Fourth Amendment rights. In *United States v. Voigt*, we instructed that a hearing should be conducted where a motion presents a colorable constitutional claim, involving material issues of fact. 89 F.3d 1050, 1067 (3d Cir.1996); *United States v. Juarez*, 454 F.3d 717, 720 (7th Cir.2006); *United States v. Harrelson*, 705 F.2d 733, 737 (5th Cir.1983). We review a district court's decision to proceed without a hearing for abuse of discretion. *See Juarez*, 454 F.3d at 719.

Here, Tagliamonte's Fourth Amendment challenge centers on the validity of the search warrant procured for his apartment. Tagliamonte maintains that the affidavit submitted by the government in support of the warrant application, while

facially valid, contained information obtained in violation of his Fourth Amendment rights. Tagliamonte identifies three constitutional improprieties, each of which, he contends, yielded, directly and indirectly, incriminating information.

First, Tagliamonte contends that he is entitled to a hearing to determine whether he was subject to an unlawful traffic stop in Weehawken, New Jersey in December 2003. Although no tangible evidence was seized during his brief detention, Tagliamonte maintains that the stop enabled police to verify his presence in Weehawken and facilitated his arrest there several days later. However, we conclude, as the District Court did, that any constitutional violation was harmless, because the traffic stop merely confirmed what police already knew—that Tagliamonte was present in Weehawken, New Jersey. Indeed, federal investigators had independently discovered through untainted information sources that Tagliamonte had used fraudulent credit cards at several Weehawken establishments, that Chase Bank had issued a fraudulent credit card to Tagliamonte at an address in Weehawken, and that the City of Weehawken had issued Tagliamonte several tickets. A. 41, 341–42. Because adequate independent evidence established Tagliamonte's presence in Weehawken, the District Court properly concluded that a hearing to determine the constitutionality of the stop was unnecessary. *See Murray v. United States*, 487 U.S. 533, 537–38, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).

■ Second, Tagliamonte contends that he is entitled to a hearing to determine whether probable cause existed for his arrest. Tagliamonte does not dispute that federal investigators were aware of facts linking the Alamo rental car to criminal activity, including that the car had been rented, and tickets issued to the car paid, with fraudulent credit cards. Rather, Tagliamonte merely argues that police could not conclusively link him to the Alamo rental car, because he was arrested as he approached, but before he had actually entered, the vehicle. We fail to see the significance of the distinction urged. Even accepting Tagliamonte's version of events, there is no argument that Tagliamonte's distance from the vehicle was so great that police could not reliably determine his movement toward *that* car, rather than a different car on the street. We conclude that Tagliamonte's approach of the Alamo rental car permitted a "rational inference" that he intended to exercise control over the car, and that the subject attempting to access the vehicle was also the individual renting it. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *see Hill v. California*, 401 U.S. 797, 804, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971) ("[P]robability, not certainty, is the touchstone of reasonableness under the Fourth Amendment."). Accordingly, even if we accept Tagliamonte's version of events, probable cause existed for his arrest, and the District Court thus properly proceeded without a hearing.

Lastly, Tagliamonte seeks a hearing to determine whether police searched his apartment prior to obtaining a search warrant and, if so, whether the initial warrantless entry tainted the search warrant procured. Tagliamonte contends that police performed a warrantless search of his apartment on January 14, 2004, the date of his arrest. For his contention, Tagliamonte relies on statements made by the superintendent of his residence, Lorenzo Pena, and the superintendent's wife, Ms. Betancourt, to the government. During interviews with investigators, Pena and Betancourt indicated that federal agents searched Tagliamonte's apartment on January 14, 2004, for approximately two

hours; significantly, however, Pena stated that "he did not see any of the agents remove any contents of the apartment at that time," but that he "could not be positive." A. 143–45, 155–59. In response, the government introduced affidavits of Wally Wang, a Postal Inspector, and David Herr, a Special Agent for the FBI, both of whom denied that the warrantless entry occurred. A. 137–42. After reviewing these "conflicting factual accounts," the Court assumed, without deciding, that "federal agents did enter Defendant's apartment initially without a warrant," but concluded that untainted information contained in the warrant affidavit was adequate to support the issuance of the warrant: "[I]t is well-settled within the Third Circuit that, 'even assuming some factual averments in the affidavit are tainted, they do not vitiate a warrant which is otherwise validly issued upon probable cause reflected in the affidavit.'" A. 53 (quoting *United States v. Burton*, 288 F.3d 91, 103 (3d Cir.2002) (internal citation omitted)). Accordingly, the Court concluded that a hearing to determine whether the alleged entry occurred was unnecessary.

On appeal, Tagliamonte asserts, generally, that the "prior illegal entry . . . tainted the search warrant," and that he is entitled to a hearing to "determin[e] the extent of the agents' actions during the illegal search and the extent of any evidence found." Appellant's Br. at 20–21. Tagliamonte, however, does not explain *how* or *why* the initial unlawful entry "tainted" the subsequent search warrant. He does not argue, for example, that the warrant affidavit contained information gleaned from the warrantless search, or that information procured through lawful means, and included in the affidavit, was insufficient to sustain the issuance of the warrant. *See Burton*, 288 F.3d at 103. Nor does Tagliamonte contend that information gleaned from the initial search influenced

the government's decision to procure a search warrant. *See United States v. Perez*, 280 F.3d 318, 340 (3d Cir.2002); *United States v. Herrold*, 962 F.2d 1131, 1144 (3d Cir.1992). In short, Tagliamonte fails to articulate a causal link between the warrantless entry and the procurement of the search warrant—to explain how the search warrant, or the information included therein, impermissibly included "fruits" of the initial unlawful search. Accordingly, we conclude that any constitutional violation was harmless, and that the District Court's decision to proceed without an evidentiary hearing was not improper.

### III. Speedy Trial Act Violations

Next, Tagliamonte seeks to overturn his conviction, arguing that dismissal of the indictment was required under the Speedy Trial Act ("STA"), 18 U.S.C. § 3161 *et seq.* The STA requires the government to file an indictment or information against a defendant "within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." 18 U.S.C. § 3161(b). The proper remedy for violation of the Act is dismissal of the untimely charge. 18 U.S.C. § 3162(a)(1). We review for clear error the District Court's factual conclusions about the charges brought in the complaint and the indictment, but exercise plenary review of the Court's interpretation of the STA. *See United States v. Watkins*, 339 F.3d 167, 171 n. 2 (3d Cir.2003).

Here, Tagliamonte argues that counts three and eight of the indictment, alleging mail fraud and access device fraud in violation of 18 U.S.C. §§ 1341 and 1029(a)(3), respectively, should have been dismissed as an invalid evasion of the time limits imposed by the STA. Although Tagliamonte acknowledges that the 30–day time limit applies solely to charges in a criminal complaint, not an indictment, *see United*

*States v. Oliver*, 238 F.3d 471, 473 (3d Cir.2001), and that the complaint here did not *expressly* allege a violation of § 1341 or § 1029(a)(3), Tagliamonte insists that the 30–day filing deadline was triggered, because these offenses were nonetheless "embodied" in the complaint. Appellant's Br. at 25.

An indictment count is subject to the temporal requirements of the STA solely when it charges an offense identical to that alleged in the complaint. Because whether offenses are identical for purposes of the STA is governed by a *Blockburger*-type analysis, a violation of similar statutory provisions may be charged in a complaint and an indictment—without triggering the filing requirements of the STA—when the statutory provisions in question each contain an element of proof not required of the other. *Watkins*, 339 F.3d at 176–77.[2]

Here, application of the *Blockburger* test supports the conclusion that the complaint and indictment charge distinct offenses. The complaint alleges violations of § 1029(a)(2), and counts three and eight of the indictment allege violations of §§ 1341 and 1029(a)(3), respectively. Examination of these statutory provisions confirms that each requires an element of proof not required of the other. A defendant violates § 1029(a)(2) if he "knowingly and with in-

tent to defraud traffics in or uses *one or more* unauthorized access devices during any *one-year period*, and by such conduct obtains anything of value *aggregating $1,000* or more during that period...." 18 U.S.C. § 1029(a)(2) (emphasis added); *see* Supplemental Appendix ("S.A.") 2. Section 1029(a)(3) requires, in pertinent part, proof that the defendant "knowingly and with intent to defraud possesses *fifteen or more* devices which are counterfeit or unauthorized access devices...." 18 U.S.C. § 1029(a)(3) (emphasis added); *see* S.A. 861–63. Section 1341 prohibits use of the mail to implement a scheme to defraud. S.A. 840–51.[3] Hence, whereas § 1029(a)(2) requires proof that the defendant used unauthorized devices to obtain anything of value equivalent to or exceeding $1,000 in a one-year period, § 1029(a)(3) and § 1341 impose no monetary or durational requirement. Conversely, whereas § 1029(a)(3) requires proof that the defendant possess fifteen or more unauthorized devices, and § 1341 requires use of the mail service, § 1029(a)(2) is violated, even where only a single unauthorized device is used, and where the mail service is not utilized to commit fraud. Hence, the District Court properly concluded that the criminal complaint, and counts three and eight of the indictment, charge distinct offenses, and that dismissal of the indictment was thus not required under the STA.[4]

---

**2.** In *Watkins*, we assumed, without deciding, that a *Blockburger*-type analysis governs whether statutory violations charged in the complaint and an indictment are identical for purposes of the STA. *See Watkins*, 339 F.3d at 176–77.

**3.** Count three of the indictment alleges violations of section 1341, which provides in pertinent part,

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises ... for the purpose of

executing such scheme or artifice or attempting so to do, places in any Post Office ... any matter or thing whatever to be sent or delivered by the Postal Service ... or knowingly causes to be delivered by mail or such carrier according to the direction thereon ... any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341.

**4.** Tagliamonte also argues that the District Court erred in granting several continuances of his trial, in each instance *after* expiration of the prior deadline. We held in *United States*

## IV. Shackling

Next, Tagliamonte contends that his appearance before the jury in leg restraints deprived him of a fair trial. Tagliamonte's argument relies on a factual assumption that Judge Cavanaugh carefully considered and rejected—that his leg irons were visible to members of the jury venire, seated behind counsel's table.[5] Intimately familiar with the layout of the courtroom, Judge Cavanaugh was best-positioned to determine whether Tagliamonte's leg irons were perceptible to the jury, and we find no error in his carefully reasoned conclusions.[6]

Alternatively, Tagliamonte contends that the District Court failed to make specific factual findings supporting the application of leg restraints—a safeguard that Tagliamonte insists was unnecessary, given his indictment of a nonviolent offense. Tagliamonte relies on our opinion in *Szuchon v. Lehman*, 273 F.3d 299, 314 (3d Cir. 2001). There, we noted that district courts should develop a factual record justifying a particularized need to restrain the defendant, and approved the use of visible leg and wrist manacles, where the district court made such detailed factual findings supporting the need to restrain the defendant. *Id.* at 314–15.

Here, as in *Szuchon*, the District Court, noting the two open warrants for Tagliamonte's arrest and his rejection from two

---

[5.] As Judge Cavanaugh explained,

I take this [issue of visible shackles] very seriously, and I understand the concern. I personally got off the bench, walked around the courtroom, stood in various places, and looked to make certain that people standing and/or sitting in certain parts of the courtroom could have almost no opportunity to view the leg irons in question. This similar argument was made by other counsel, and it caused me to make certain of this.

And I've done that. I've done it again. I note . . . that both counsel tables, not just the defendant's but the prosecutor's also, are shrouded with a skirt, if you will, that matches the carpeting, that does not look out of place, that looks like it's made for these tables.

I also note that behind the Defendant, there are one, two, three, four, five, six, at least six high-backed chairs that go above the bar in question with the openings, and they cover the vast majority of the openings that would be there, and that's one of the reasons you can't see.

I also note that the lighting is such that it makes it very difficult to see under the tables where these people would have to see. I also note that the Marshals on occasion, doing their job as they do, sit in some of those chairs to even block the view further. And I think we have taken every precaution under the circumstances.

S.A. 161–62.

[6.] Alternatively, Tagliamonte, maintains that shackling is *per se* impermissible, because the "use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." Appellant's Br. at 27–28 (quoting *Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970)). The excerpt from *Allen* upon which Tagliamonte relies, however, addressed a markedly different situation—a defendant shackled and gagged in plain sight of the jury. 397 U.S. at 344, 90 S.Ct. 1057. Here, however, Tagliamonte's leg irons were scrupulously concealed. To avoid detection of the restraints and to preserve the dignity of judicial proceedings, Judge Cavanaugh excused the jury during sidebars with Tagliamonte and counsel, directed the Marshals not to move Tagliamonte in the presence of the jury, and permitted Tagliamonte to use private hallways and bathroom facilities. S.A. 135, 137, 163.

---

*v. Brooks*, 697 F.2d 517, 522 (3d Cir.1982), that a continuance may not be granted after the applicable time limit has elapsed. Tagliamonte maintains that the 30–day time limit had expired here, because he was arrested on January 14, 2004, and indicted on October 5, 2004. The 30–day limit, however, applies solely to charges in the complaint, not the indictment. *Oliver*, 238 F.3d at 473. Here, none of the charges in the indictment were included in the complaint and, therefore, dismissal of the indictment was not compulsory.

jails as a "pest," made specific factual findings justifying leg restraints. S.A. 132, 134, 136. Even assuming, *arguendo,* that the application of leg irons was error, Tagliamonte suffered no prejudice, as the restraints were concealed from the jury's view.[7] Accordingly, we conclude that Tagliamonte's appearance in leg restraints did not deprive him of a fair trial.

## V. Discovery Violations

■ Next, Tagliamonte contends that the Court should have suppressed his incriminating statements to a government agent, which were disclosed by the government to defense counsel on the eve of trial, several years after the court-ordered discovery deadline had passed. In January 2007, the government learned that Tagliamonte had made incriminating statements to a Postal Inspector, Scott Matthews. The statements were discovered by the government during its preparation of Matthews for trial, and were immediately conveyed to defense counsel. S.A. 173. The Court concluded that the government's prompt disclosure complied with its discovery order and with Fed.R.Crim.P. 16(a)(1)(A) and 16(c), which imposes a continuing duty to disclose incriminating statements made by a defendant. The District Court concluded, alternatively, that any discovery violation was harmless, because Tagliamonte failed to demonstrate that he suffered any prejudice from the tardy disclosure of his statements. S.A. 173–77.

On appeal, Tagliamonte argues that Rule 16(a)(1)(A) was violated because the government knew, or should have known, about his incriminating statements to Matthews prior to January 2007. However, Tagliamonte fails to mention, much less persuade us of, a fact essential to his success on appeal—that he suffered unfair prejudice as a result of the government's late disclosure. *See United States v. Lopez,* 271 F.3d 472, 483–84 (3d Cir.2001) (requiring reversal only when defendant demonstrates a "likelihood that the verdict would have been different had the government complied with the discovery rules") (quoting *United States v. Mendoza,* 244 F.3d 1037, 1047 (9th Cir.2001)). Although the statements were disclosed only weeks before trial, Tagliamonte does not contend that the untimely disclosure required modification of his trial strategy or otherwise impaired the presentation of a complete defense. *See id.* at 484 (denying defendant's request for a new trial based on discovery violation, where "[h]e [defendant] does not attempt to explain how the government's failure resulted in a denial of his right to a fair trial"). Especially revealing is the fact that Tagliamonte did not seek a continuance before the District Court. Because Tagliamonte has failed to make the required "showing of prejudice," the Court properly exercised its discretion to permit the government to use Tagliamonte's statements at trial. *Id.*[8]

---

7. *See United States v. Chung,* 329 Fed.Appx. 862, 867–68 (11th Cir.2009) (per curiam) (holding that possible visibility of defendant's shackles to jury *venire* was harmless error, "given the unlikelihood that any *impaneled* juror saw the shackles, the district court's frequent instructions on the presumption of innocence, [and] the district court's consistent admonishments to the jury to consider only the evidence presented and to form no opinion concerning guilt or innocence until the close of the evidence") (emphasis added).

8. We note that the specific relief requested—suppression of Tagliamonte's incriminating statements—was also unwarranted, because Tagliamonte failed to demonstrate that less severe alternatives, such as a continuance of the trial, were inadequate. *See United States v. Euceda–Hernandez,* 768 F.2d 1307, 1312 (11th Cir.1985) (holding that courts should fashion "the least severe sanction that will accomplish the desired result—prompt and full compliance with the court's discovery or-

## VI. Sentencing

■ Lastly, Tagliamonte contends that the District Court erred in granting an upward departure from the applicable Guidelines range. Judge Cavanaugh imposed an 180 month prison term—36 months longer than the term proposed by the government, and 75 months longer than the maximum term of 105 months prescribed under the Guidelines.

The Supreme Court has recently clarified the proper methodology for determining an appropriate sentence: "[T]he Guidelines should be the starting point and the initial benchmark" in determining the appropriate sentence. *Gall v. United States,* 552 U.S. 38, 128 S.Ct. 586, 596, 169 L.Ed.2d 445 (2007); *see United States v. Smalley,* 517 F.3d 208, 211 (3d Cir.2008). After calculating the applicable Guidelines range, a district court should scrutinize the facts of the individual case to determine whether an upward or downward departure is warranted under 18 U.S.C. § 3553(a). *Smalley,* 517 F.3d at 211.

Tagliamonte contends that an upward departure was not justified by any "extraordinary consideration," that the articulated rationale for the variance from the Guidelines—Tagliamonte's prior convictions—was already reflected in his criminal history score, and that the government itself recommended a shorter sentence than that imposed by the Court. Appellant's Br. at 36. Our review of an above-Guidelines sentence is governed by well-established principles:

> The range recommended by the Guidelines is one of the factors to be assessed in the sentencing calculus, but, just as a sentence within that range is not presumptively reasonable, a sentence outside of it is not presumptively unreasonable. And, of course, a district court is in no way bound by the parties' sentencing recommendations. Indeed, perfunctory adoption of one party's position-or both, if the parties agree-would arguably violate the court's statutory duty to exercise "independent judgment" in its weighing of the relevant factors and crafting of the final judgment. The reasonableness of a sentence depends not on the district court's adherence to the range recommended by the Guidelines or the parties but on its adherence to the mandate of the Sentencing Reform Act to give meaningful consideration to the factors of 18 U.S.C. § 3553(a).

*United States v. Schweitzer,* 454 F.3d 197, 204 (3d Cir.2006) (internal citations omitted).

Here, we conclude that the District Court adequately considered the § 3553(a) factors in its sentencing determination. S.A. 124–26. In imposing a sentence above the Guideline range, the Court stressed Tagliamonte's extensive criminal record and unresponsiveness to previous punishment. Tagliamonte's lengthy criminal history, violation of supervised release, and commission of crimes while a fugitive and on parole demonstrated not only a profound disrespect for the law but also the need for more severe penalties to deter future misconduct, in the Court's view. *Cf. United States v. Fisher,* 502 F.3d 293, 309 (3d Cir.2007) (deeming relevant to the § 3553(a) analysis the defendant's commission of a crime shortly after his release from prison). Tagliamonte's use of fraudulent aliases during and after his arrest, moreover, reflected a refusal to accept personal responsibility for his crimes. An above-Guidelines sentence, the Court reasoned, was also necessary to reflect the financial devastation wrought by Tagliam-

ders") (quoting *United States v. Sarcinelli,* 667 F.2d 5, 7 (5th Cir. Unit B 1982)).

onte's acts, which produced actual and intended losses of $128,000 and $982,000, respectively, and which impacted countless individuals and businesses. *See Schweitzer*, 454 F.3d at 200–202 (approving sentence 50% above the recommended Guidelines range, where the monetary loss was substantial, and where the defendant committed the offense under supervision and repeatedly refused to rehabilitate himself). We conclude that the District Court properly considered the § 3553(a) factors, and that the sentence imposed was reasonable.

## VII.

For the foregoing reasons, the judgment and sentence of the District Court will be affirmed.